**McSHAIN v. UNITED STATES.**

No. 43834.

Court of Claims.

May 6, 1946.

590

Prentice E. Edrington, of Washington, D. C., for plaintiff.

James J. Sweeney, of Washington, D. C., and Francis M. Shea, Asst. Atty. Gen., for defendant.

Before WHALEY, Chief Justice, and LITTLETON, WHITAKER, JONES, and MADDEN, Judges.

LITTLETON, Judge.

Plaintiff and defendant entered into a contract on February 6, 1933, for construction of a Naval Hospital at Philadelphia. The original contract price was $2,587,600. Plaintiff first claims $14,544.19, including overhead and profit, on nine separate items under this contract for certain alleged changes, extra work, and materials. The work and materials involved in these claims were specifically ordered by defendant from time to time and performed and furnished by plaintiff under protest made at the time. Under an arrangement suggested by the Public Works Officer, who was duly authorized to act for the Chief of the Bureau of Yards and Docks as the contracting officer, the presentation of claims by plaintiff for extra work and materials

on disputes arising during prosecution of the work, and the consideration and decision thereof by the Board on changes were postponed until completion of the contract. The claims here involved were so presented to the Board and the contracting officer, and considered and denied by a majority of the Board and by the contracting officer. Many other claims on disputes which arose during prosecution of the work were so made and presented, and were allowed and paid. In addition to these disputes and claims numerous other changes and extra work were formally ordered during prosecution of the work, and, as to these, the increases or decreases in the contract price were fixed and agreed upon by the Board on changes of which plaintiff was a member.

The second claim of plaintiff for $11,-809.74 is made up of seven items of additional costs for increased wages and other expenses incurred and paid under and by reason of the National Industrial Recovery Act of June 16, 1933, 48 Stat. 195, and a supplemental written agreement made in connection with defendant's written order dated September 14, 1933, that all operations under the original contract must be carried on and performed under and in accordance with the Recovery Act and the requirements, regulations, and instructions of the Emergency Administrator of Public Works.

The several items of the claim under the original contract for changes, extra work, and materials will be first considered.

■ The first question in connection with this claim is whether, under the facts and circumstances disclosed by the record, the purported decision dated December 3, 1937, by the head of the Navy Department on plaintiff's appeal from the action of the contracting officer on his claims was final and conclusive under article 15.

Defendant relies upon the letter (plaintiff's exh. C) signed by the acting Secretary of the Navy as a final and conclusive decision against plaintiff under art. 15 of the supplemental contract. Upon the evidence offered by plaintiff we are of opinion that the facts and conclusions set forth in this document dated December

3, 1937, and mailed to plaintiff, were not conclusive against plaintiff for the reason that the letter did not represent or constitute the kind of decision on appeal which the contract contemplated and required. The evidence is sufficient to show that the facts and conclusions therein set forth were not arrived at by the head of the department or by the Judge Advocate General, as his duly authorized representative, from a personal and independent consideration of the issues and the record by either the Secretary or the Judge Advocate General in a fair and impartial manner with due regard to the rights of both the contracting parties. Ripley v. United States, 223 U.S. 695, 701, 702, 750, 32 S.Ct. 352, 56 L.Ed. 614; Morgan et al. v. United States et al., 298 U.S. 468, 470, 481, 56 S.Ct. 906, 80 L.Ed. 1288; and Id., 304 U.S. 1, 16-21, 58 S.Ct. 773, 999, 82 L Ed. 1129; Hirsch v. United States, 94 Ct.Cl. 602, 634; Penker Construction Company v. United States, 96 Ct.Cl. 1, 44-46, 59.

Article 15 of the original standard form of construction contract limited the decision of the head of the department, "or his duly authorized representative," to questions of fact.

Article 18 provided that "his representative means any person authorized to act for him." Article 15 of the supplemental contract "P.W.A. Form No. 51," provided for decision of "all disputes arising under this contract," and par. 9 of this contract made its provisions applicable in any instance of conflict with the terms of the original contract.

When plaintiff filed his timely appeal the Acting Secretary of the Navy instructed the Judge Advocate General to give plaintiff a hearing on the appeal.

The evidence is sufficient to show that the Secretary did not authorize the Judge Advocate General to make the final decision of the claims in the appeal, but under the reference he was authorized to make a report to the Secretary of his recommendations with reference thereto. Article 15 authorized such reference by the Secretary and recommendations by the Judge Advocate General, but it did not authorize the further delegation of author-ity by the Judge Advocate General. Upon receipt of instructions from the Secretary, the Judge Advocate General instructed that a hearing be arranged but, instead of hearing the appeal and preparing recommendations from a study of the issues and the records, he referred the appeal to an attorney holding a minor position in his department and instructed the attorney to attend the hearing as his representative and thereafter to prepare the decision on the appeal for the Secretary's signature. The attorney did this and, without consultation with anyone, except certain witnesses for the Government with whom the attorney discussed the case after the hearing, prepared the decision of the claims on appeal in the form of a letter addressed to plaintiff for the signature of the Secretary. This letter was passed in the usual office routine manner to the Judge Advocate General, who approved it, and, in the same way, it was passed to the Acting Secretary who signed it. Neither the Judge Advocate General nor the Acting Secretary discussed the case with the attorney before or after the decision had been so prepared, nor did either ask the attorney any questions concerning the facts and conclusions set forth therein before approving the letter as written.

We are of opinion from the evidence presented, a study of the record which was before the Navy Department, and the statements and conclusions set forth in the letter of December 7 that the attorney who prepared the decision on the several issues presented was the only person who gave any independent study or thought to the record on appeal or to the contract, drawings, and specifications.

In disposing of plaintiff's appeal, the Acting Secretary and the Judge Advocate General, as the Secretary's representative, were not acting in an executive or administrative capacity in which a matter could be referred for action to a third person, but were acting as arbiters charged by the contract with the duty of giving personal and independent consideration to the issues and the evidence presented with reference thereto in arriving at a fair and impartial decision on the appeal, as required by art. 15. Plaintiff has shown by the prepon-

derance of evidence a lack of compliance with the contract requirement that the decision of the issues presented by the appeal be made by the personal consideration of the record by the Secretary or by a person duly authorized to act for him. The attorney who prepared the decision was not so authorized. Sun Shipbuilding & Drydock Co. v. United States, 76 Ct.Cl. 154, 190, 191; Phœnix Bridge Co. v. United States, 85 Ct.Cl. 603, 626; Hirsch v. United States, supra.

·The letter of December 7, 1933, cannot therefore be held to be final and conclusive against plaintiff in this case. Since an appeal was taken, the decisions of the contracting officer were not final and conclusive.

■ The first item of the claim under the orginal contract is for additional cost of $2,786.24, plus overhead and profit of $585.11, for furnishing and installing sheet copper for waterproofing purposes in addition to membrane waterproofing in the boiler room floor of the east wing of the hospital building, The 6-inch concrete boiler room floor slab was first constructed under supervision and with the approval of defendant, as called for by the specifications, with 5-ply membrane waterproofing. About three months later underground water pressure, which had not been foreseen or expected by defendant when it designed the boiler room floor, caused the 6-inch concrete floor slab to bulge and become displaced about 12 inches. Defendant gave plaintiff written instructions to replace the boiler room floor and directed him to use sheet copper in the concrete slab and up the side walls of the boiler room to the height specified in the specification in addition to all other waterproofing means used, and advised him that further directions would be given as to further reinforcing the floor slab against hydrostatic pressure. Plaintiff was later directed to install an additional concrete slab reinforced with railroad steel rails. Plaintiff proceeded as directed and claimed the right to be paid for all this work and for the materials as extra under the contract. There was no dispute at the time as to plaintiff's right to such extra payment. The dispute as to payment for the sheet copper arose later. The extra work and materials were made necessary by reason of an unforeseen or changed condition under art. 4 of the contract. The sheet copper was ordered installed in addition to 5-ply membrane for waterproofing purposes only, but when the time came for determination and payment of the amount due for the extra work and materials the majority of the Board on changes and the Public Works Officer, who acted for the contracting officer in ordering the work, paid plaintiff only $8,804.19 for certain of the extra work and materials, and refused to pay him $2,786.24 plus overhead and profit for the sheet copper waterproofing and the work of installing it. The contracting officer approved this action.

The west end of the boiler room floor slab joined the east wall of the central section of the hospital building and when the claim came on for consideration plaintiff was denied payment for this extra cost on the sole ground that drawing 115582, being the drawing for the caisson foundation for the central section of the hospital building, contained, among others, a "note" which stated: "In all slip joints and expansion joints provide copper expansion strips." Only a very small portion of the sheet copper waterproofing installed was in a portion of a "slip joint." Defendant in this suit seeks to sustain this action of the Board and the Public Works Officer as being in accordance with the alleged requirement of the contract, i. e., that copper strips be installed in all slip joints.

We find it unnecessary to decide whether or not the contract as finally made on plaintiff's bid under alternate No. 3 required plaintiff to provide copper strips in all slip joints and expansion joints for the reason that throughout the entire construction of the hospital building, consisting of the central 16-story section and six 4- and 5-story wing sections with slip joints between each of the six wings and the central section, the parties interpreted the contract, as finally made, as not requiring such copper strips and proceeded to construct the entire building with 5-ply membrane for waterproofing purposes and such membrane and caulking compound in all slip joints. Moreover, the specifications

specifically called for 5-ply membrane for waterproofing purposes (finding 31), and the sheet copper installed in the boiler-room floor was ordered installed for that purpose. In addition the specification contained various provisions (finding 23) with reference to construction of slip joints and expansion joints. As to slip joints the specification provided: "All vertical 'Slip Joints' where marked on drawings and details throughout their entire height shall be carefully filled with caulking compound." Plaintiff, with the knowledge and approval of defendant, installed felt membrane and caulking compound in all slip joints. The specification provided that expansion joints be "filled with premolded joint material" as specified. When the boiler-room floor broke, due to excessive and unanticipated hydrostatic pressure, all slip joint construction between the several sections of the building had been completed, as above stated, with defendant's approval. Moreover, during progress of the work, the defendant, by a change order, ordered construction of additional slip joints in all tile walls, and these joints were constructed with membrane strips and caulking compound, rather than with copper strips, with defendant's approval.

Defendant's officers, notwithstanding their acquiescence and approval of the construction of slip joints without copper strips, seized upon the above-quoted "note" on drawing 115582 as a means of avoiding payment to plaintiff for a substantial portion of the extra cost of reconstructing the boiler room floor so that it would be waterproof against the hydrostatic pressure encountered. This action was clearly erroneous in the circumstances.

Neither the contract as made with the related contract documents nor defendant's evidence shows clearly that the contract intended the use of copper strips as indicated in the note on drawing 115582. In the first place that note is in conflict with a literal reading of sections 7–07 and 20–41 of the specification as to slip joints and is in clear conflict with the plain provisions of sections 4–05 and 5–35 of the specification as to expansion joints. The decision of defendant's officers was also in direct conflict with the specification pro-

visions, section 6–01(a), 02, and 03, page 19, and section 52–02, item 6, page 258, as to waterproofing. Only a comparatively negligible portion of the amount of sheet copper installed on defendant's order solely for waterproofing purposes was in a part of the slip joint between the west end of the boiler room and the central section. In the second place the evidence shows that the sheet copper would never have been ordered installed in this small portion of the slip joint or elsewhere in the boiler room had the excessive hydrostatic pressure not developed.

When this boiler room controversy arose plaintiff conferred with F. W. Southworth, the project manager in the Office of the Bureau of Yards and Docks, who had considered and approved the contract drawings before they were signed by the Chief of the Bureau of Yards & Docks, and he stated that it was his opinion that the contract as made did not call for or intend the use of copper strips in slip joints and expansion joints.

Plaintiff is entitled to recover $3,371.35 on this item of the claim.

▉ The second item of this claim is for $292.28, plus overhead and profit of $61.38, for furnishing and installing under protest and on defendant's order four bulletin boards at certain places in the building (finding 37) shown on certain of the drawings for electrical wiring and not shown or indicated on the architectural drawings. Fifteen bulletin boards and their locations were specifically shown and called for on the architectural drawings. The specifications properly interpreted called for installation by plaintiff of only those bulletin boards which were called for on the architectural drawings. The specifications in section 17–(i); 18–01(c), and 37–19 and –77 contemplated the installation of boards in the central section and the nurses' quarters of the building but did not contemplate or intend that such boards be installed in the "Corps Quarters." The fifteen boards shown on the architectural drawings were in the central section and the Nurses' Quarters. We think the specifications therefore intended to call for the boards shown on the architectural draw-

ings. Electrical drawings are for the purpose of diagrammatically indicating the electrical wiring system and the location, rating, and characteristics of each outlet, and such drawings are not intended to serve the purpose of designating structural requirements other than those relating to electrical work.

The installation of the four bulletin boards in question was extra work not called for or contemplated by the contract and specification. The contracting officer in effect admitted this when, by a change order, he paid plaintiff extra for the latches, locks, and keys for two of the four bulletin boards which he required be installed by plaintiff under the electrical drawings.

Plaintiff is entitled to recover $353.66 on this item.

■ The third item is for $2,100, plus overhead and profit of $441 (findings 44–47), representing the difference between the cost of 16 cents a square foot for 5-ply membrane waterproofing and a fabric divorcing member, installed in that portion of the concrete approach driveway located over hospital storage rooms, and the cost of 2 cents a square foot for the conventional roadway mastic tar waterproofing ½″ thick. There were 15,000 square feet to be waterproofed.

Plaintiff's contract required him to install this concrete slab and to waterproof it. The section of the slab in question was the first two layers of 3″ and 2″ which served as a top or roof over certain hospital storage rooms and, when completed with an additional road-surface layer of from 4½ to 6 inches, as shown on drawing 115410, it also served as the approach driveway to the main first-floor entrance of the hospital.

The contract, as made, called for the use of 5-ply membrane waterproofing material and defendant required plaintiff to use this material with an additional fabric divorcing member in waterproofing the first concrete slab in question. This action was in accordance with the requirements of the contract. Sec. 22–10 of the specification required the use, in addition to 5-ply membrane, of a fabric divorcing member where,

as here, a concrete fill is installed over the roofing and waterproofing material.

Plaintiff is not entitled to recover on this item.

■ The fourth item of the claim (finding 51) is made up of two amounts for alleged extra fabric dampproofing. First, the amount of $1,089.72 plus overhead and profit of $228.84 or $1,318.56 is claimed for extra fabric dampproofing on spandrel beams; and, second, $351 plus overhead and profit of $73.71, or $424.71 for fabric dampproofing over the exterior of foundation walls.

On the evidence and under section 6–16 of the specification and the drawings plaintiff is not entitled to recover on the item of $1,318.56 for the alleged additional fabric dampproofing over the face of spandrel beams. The specification, supra, specifically provided as to "spandrel dampproofing" that "All spandrel beams * * * shall have beams covered with waterproofing fabric * * * extending * * * down the face of spandrel beam and out on face brick to within 1 inch of the exterior face of wall." Defendant required plaintiff to conform to this provision in applying fabric dampproofing over spandrel beams. There was a conflict between this provision of the specification and drawing, 115497, entitled "Nurses Quarters" (finding 54), but other drawings showing spandrel dampproofing were consistent with the specification requirement. Drawing 115497 showed four instances of inner and outer wall construction at spandrel beams. In these instances the drawing showed the waterproofing fabric as extending down over the outer part of the spandrel beam, coming down slightly more than halfway and turning out on the steel veneer clip or angle under the outer brick facing supported thereby. Plaintiff accepted this drawing as typical of the wall construction throughout the entire building. The claim here made is for extra fabric waterproofing and the work of installing it over the entire face of spandrel beams throughout the building, other than on the beams so shown on drawing 115497. Defendant allowed plaintiff an extra payment for the spandrel beam waterproofing in-

stalled in the Nurses' Quarters in addition to that shown on drawing 115497, notwithstanding the conflict between the specification provision of section 6–16, and denied his claim for the amount here claimed.

Plaintiff's interpretation of the specification and drawings as to this spandrel waterproofing was not justified and defendant's action in requiring him to install the waterproofing fabric in such manner as to cover the entire face of the spandrel beams in question was in accordance with the express provisions of the specification. Plaintiff is therefore not entitled to recover the item of $1,089.72 plus $228.84 for overhead and profit.

■ The second item of $424.71, including overhead and profit, of this claim for extra waterproofing fabric required by defendant presents a different situation (findings 52, 59–62). The defendant, through the Public Works Officer, construed section 6–16, supra, of the specification as to fabric waterproofing over "All Spandrel beams not protected by roofing material or metal flashing" to include certain foundation walls of the central section and the Nurses' and Corps' Quarters buildings, which were below grade and below any occupied or used space in these buildings. This action was contrary to the contract and was in clear conflict with the expressed and intended provisions of the specification. The walls in question were clearly not "spandrel beams" within the meaning of the language used in the specification. In addition to the spandrel beam waterproofing requirements the specification, in section 6–01(b) and (d) and 6–14, contained numerous provisions with reference to dampproofing or waterproofing of exterior walls, and these foundation or girder walls are not included in such sections among those specified. The drawings did not show fabric waterproofing over the exterior face of these walls and the proof clearly shows that they were not "spandrel beams" as that term was used in the specification.

Plaintiff is entitled to recover $351 for the cost of this extra fabric waterproofing and work, plus $73.71 for overhead and profit, or a total of $424.71.

■ The fifth item of this claim is for extra cost of $5,400.75, plus overhead and profit of $1,134.16, totalling $6,334.91, for certain changes and extra work in connection with plastering. This claim is divided into four items (finding 66), which will be separately considered. Plaintiff's claims for extra payment on these items were presented to and were erroneously denied by a majority of the Board on changes and such action was approved by the contracting officer.

(a) The first item is for $2,880 plus overhead and profit of $604.80, or $3,484.80 representing the cost of providing V-joints or quirks between the finished plaster coat in all rooms and the metal trim of all doors and windows. This was clearly extra work not called for by the specification and drawings. It was ordered by defendant and plaintiff protested it as being in addition to the plaster finish called for by the contract. Sections 17–12, 26–24, and 26–60 and the drawings required that the plaster be finished flush with the metal trim. Plaintiff began the plastering work in the northeast portion of the first floor of the hospital central section. After this work had been completed, under the supervision and with the approval of defendant's inspectors, and plaintiff had moved to an adjoining section to continue this work, defendant temporarily stopped the work because it was observed that there was a "hairline" separation of the plaster from the metal trim. This was due entirely to the difference between the expansive and contractive properties of the metal trim and the plaster. In some instances this hairline separation was "staggered" because it had been applied flush as required. The metal trim specified and used was slightly rounded where the flush finish occurred and the finished plaster coat at the trim was necessarily thin and almost a feather edge. This separation was not, as shown by the evidence, a "crack" in the plaster surface which sec. 26–60 of the specification required plaintiff to avoid. This separation and its appearance were wholly unavoidable with a flush finish. This was well known in the trade and was known or should have been known by defendant when the specification and draw-

ings were prepared. There was then no known means of preventing this hairline separation between the metal trim and plaster. Plaintiff based his bid on the flush finish called for. Defendant's officer in charge, who on behalf of the contracting officer ordered and directed a change in the plaster finish around the trim of all doors and windows, admitted in his testimony herein that when plaintiff applied the plaster flush with the trim he strictly complied with the specification requirement.

In order to overcome the appearance of the flush finish because of this slight separation defendant ordered plaintiff to finish all plaster flush with the trim and, after the plaster had partially set, to go back over the flush finish and cut a V-joint or "quirk" in the flush finish around the edges of all doors and windows. This V-joint was about ⅛th-inch deep and about ¼th of an inch wide, with the plaster surface edge of the V-joint being slightly rounded. The separation of the plaster from the trim remained but such separation appeared at the bottom of the V-joint. The work as so performed was not a flush finish. Both a flush finish and a finish with a V-joint or quirk were recognized in the plastering trade, but a V-joint is not a part of a "flush finish" and is not made unless specifically called for. It is also customary for the owner's architects to show or call for a V-joint or "quirk" in the specifications and drawings when such a joint rather than a flush finish is desired.

This was a change in the contract work and was extra work thereunder, and the defendant was clearly in error when it refused to pay plaintiff the extra costs incurred by reason thereof. Plaintiff therefore is entitled to recover his costs, plus 10 percent for overhead and profit, amounting to $3,484.80 on this item.

(b) The next item (finding 76) is for additional costs of $1,010.82 plus $212.27 for overhead and profit due to a second change in the lead-lined masonry walls of X-ray rooms. The contract originally called for plastered masonry partitions to be constructed of blocks of cement gypsum of fibrous material in two layers with ¼" sheet lead supported between the two layers. Early in 1933 the contracting of-

ficer sent plaintiff a letter directing him to "use channel partitions and lead lining in place of masonry and lead for ray-proofing," and advising him that "the changes [there were 24 stated in the letter] mentioned shall be in accordance with specifications to be furnished you by the Bureau." Most of these twenty-four changes involved small items and related to omissions from the contract and decreases in the contract price. No written specifications for these changes were furnished but plaintiff submitted his proposals, particularly with reference to the change here involved, which was item 4 in the list, and the specifications for the materials and construction of the channel partitions were orally agreed upon between plaintiff and the contracting officer, and they also agreed upon a decrease of $2,493.14 in the contract price on account of this change (findings 77–79). In agreeing upon this reduction, which was reported by the Board on changes and approved by the contracting officer, plaintiff and the Public Works Officer, who had authority to act for the contracting officer, agreed upon 1-inch steel channels spaced 16 inches to support the lead lining and plaster boards. The proof shows that 1-inch channels spaced 16 inches were sufficient and adequate to properly support the lead-lined partitions. In approving the abovementioned agreed decrease in the contract price, the contracting officer in April 1933 issued a formal change order in which he directed plaintiff to use the channel partitions and lead lining in place of masonry and lead for ray-proofing "as directed by the Officer in Charge and as covered by outline specifications and estimates heretofore agreed upon." Later, plaintiff prepared and submitted a drawing showing 1-inch channels spaced 16 inches, and sometime later commenced construction in that manner. The drawing was thereupon returned by the Public Works Officer with written directions thereon requiring plaintiff to use 1½-inch channels spaced 12 inches. Plaintiff protested this requirement and made claim for the additional work and materials occasioned by this change in the first change as agreed upon. Plaintiff's claim for the additional cost for labor and material was denied.

This action was clearly erroneous. The additional cost plus overhead and profit, by reason of the order to use 1½-inch channels spaced 12 inches, was $1,223.09, and plaintiff is entitled to recover this amount.

Defendant argues that plaintiff cannot recover on this item because no agreement as to the structure of the channel partitions has been shown, but the contracting officer stated and confirmed in writing that such an agreement had been had. Defendant also argues that plaintiff cannot recover because of the provision of par. 26 of the General Provisions of the specification to the effect that "No oral statement of any person whomsoever shall be allowed in any manner or degree to modify or otherwise affect the terms of the contract." This provision is not applicable here. It was defendant's fault that written specifications as to the channel partitions were not furnished. The proof shows without contradiction that the materials and construction of the channel partitions were agreed upon, and the fact that they were so agreed upon was confirmed in writing.

(c) The next item of additional cost of $1,332.50 plus overhead and profit of $279.83 relates to additional plaster work in the construction of enlarged pipe spaces for plumbing and heating pipes. These pipe spaces were indicated on the contract drawings as being furred out and covered with plaster work so as to simulate the appearance of a beam, the bottom of the false beam being shown on the drawings as extending from the wall the same distances and coincident with the line of side-wall pilasters. During the work it was found that in many instances the spaces provided and allowed on the drawings for these furred pipe spaces were too small to permit of installation of the required pipes. Plaintiff prepared and furnished defendant a detailed drawing showing the arrangement necessary for installation of the pipes, the spacing of expansion joints, and the installation of return piping of the heating system. This drawing was approved in writing by the contracting officer. This drawing showed the necessity of using a larger pipe space than was shown on the contract architectural drawing. Every ef-fort was made by plaintiff to get the piping into the space as originally shown on the contract drawing, but this could not be done. The contracting officer made a change in the contract drawing and authorized and directed plaintiff to fur the pipe spaces larger than originally called for. This involved extra work and expense, and plaintiff made claim therefor. After the work had been completed a change order was issued but the majority of the Board on changes and the contracting officer allowed only a part of the necessary additional cost incurred and declined to pay that portion of the actual extra cost of $1,332.50 here involved on the unjustified ground that this portion of the extra cost was offset by an assumed saving in the plumbing and heating work through the use of a larger pipe space than was provided by the contract. The assertion that there was a saving in the cost of the plumbing and heating work was clearly not true. If there was any difference in the cost of plumbing work the actual cost was greater instead of less because of the painstaking effort made by plaintiff to get the required pipes within the spaces originally provided. In some cases pipes were removed and reinstalled in an effort to decrease the space actually required thereby.

Plaintiff is entitled to recover $1,612.33, including overhead and profit, on this item.

(d) This item of $177.43 (finding 89) represents the actual cost, including overhead and profit, to the plastering subcontractor for installing and removing two experimental paper and plaster slip joints upon the order and direction given to plaintiff by the contracting officer.

The slip joints between the several sections of the building extended through the abutting walls, including the plaster of the interior walls on each floor. There was no provision in either the specifications or the drawings that the interior plaster work at these slip joints should receive special treatment or should be applied, other than in the usual and customary manner, to walls without slip joints. When the plastering work was first begun in October 1933, defendant decided to issue a change order so as to provide for a special plaster joint at all slip joints, but it was un-

certain as to the type of joint that would best serve the desired purpose. Defendant desired to obtain a plaster joint that would give the best possible appearance but in which the plaster on the two walls on either side of the slip joint would not join, thus avoiding the unsightly appearance of any break in the plaster at the slip joint due to settlement of the walls. For the purpose of deciding upon the type of joint desired the defendant, through the Public Works Officer, first directed plaintiff and plaintiff, in turn, directed his subcontractor, who was present at the conferences on the matter, to provide a tooled plaster joint, referred to in the record as a "bullnose" joint. This was a joint where the plaster was not applied over the slip joint but was applied thicker and tooled, or rounded, on each side thereof so as to leave a small opening between the plaster so applied on each side of the slip joint. This opening is referred to in the record as a "radius." In this first experimental tooled joint, which was installed under the strict supervision of defendant, this opening or radius was a little more than ⅛th inch. Upon completion of this joint defendant thought that perhaps a joint known as a "paper joint" would give a better appearance. This was a plaster joint installed by placing paper over the slip joint and plastering over it on each side of the slip joint by using a strip of wood, to be later removed, as a ground, so that any crack that might result from any uneven settlement of the walls would appear at the paper line. In this joint the plaster on the two walls did not join at the slip joint but instead of being raised or applied thicker at the joint it had a smooth or even surface at and on each side of the slip joint. Two such experimental paper joints were ordered installed. After these three joints had been completed, defendant decided to adopt and use the tooled or bullnose joint but with a smaller radius. Thereupon defendant directed plaintiff and his plastering subcontractor to remove the two paper joints and to install tooled joints with a ⅛th-inch radius throughout the building at all slip joints. This was done. There was no dispute as to this being extra work under the con-

tract. The matter of the amount to be paid therefor was considered by the Board on changes after the contract work had been completed. When the type of joint desired had been decided upon by defendant, plaintiff asked his subcontractor to give him a proposal for the additional work incident to the change. In October 1933, the subcontractor gave plaintiff a proposal of $768.11 for the additional work of providing the tooled joints as ordered and, also, a statement for $177.43 for the cost of installing and removing the two experimental paper joints ordered by defendant. Plaintiff duly submitted his claim for these two amounts, plus overhead and profit, to the Board on changes and the Board heard plaintiff thereon and considered the claim, as it did on all other claims here involved. The Board allowed the amount of $768.11 as an extra and a majority of the Board denied payment of the $177.43 for installing and removing the paper joints. The Board gave no reason for this denial. Plaintiff protested this action to the contracting officer but he approved the action of the Board. This action was clearly erroneous and under the contract and on the facts plaintiff is entitled to recover $177.43 plus $37.26 for overhead and profit, or $214.69.

The next claim is for $11,809.74 (finding 100) consisting of five items of extra costs incurred and paid as a result of enactment of the National Industrial Recovery Act of June 16, 1933, and by reason of a supplemental "P.W.A. Form 51" contract dated November 9, 1933, in connection with defendant's order of September 14, 1933, that from that date all operations under the original contract would be carried on under and with funds appropriated by the National Industrial Recovery Act and under regulations of the Emergency Administration of Public Works (findings 93–96).

The original contract was a lump-sum prevailing wage rate contract and on September 14, 1933, plaintiff was and had been paying the prevailing rates of wages and no question had been raised with reference thereto. Although funds had been appropriated for this contract and work, the contracting officer wrote plaintiff that as of

September 2, 1933, the Emergency Administrator of Public Works had allotted $2,-250,000 of National Industrial Recovery Act funds to this contract and that all future payments would be made from these N.I.R.A. funds; that the hours of labor would be thirty hours per week; that the minimum hourly wage rates would be 50 cents for unskilled labor and $1.20 for skilled labor. Plaintiff was further advised as follows:

"All further operations under the contract will be carried on in conformity with the requirements of the National Industrial Recovery Act and the instructions of the Federal Emergency Administrator of Public Works pursuant thereto. Your attention is called particularly to Section 206 of that act, and to the Federal Emergency Administration of Public Works Bulletin No. 51, dated September 7, 1933.

\* \* \* \* \* \*

"It is requested that you keep an accurate record in such form as to be readily susceptible of verification, of the actual and necessary additional expense for material and labor to which you may be put by reason of the further performance of the contract subject to the requirements of the National Industrial Recovery Act, and submit from time to time to the Bureau through the Fourth Naval District your statements of such additional cost for appropriate action looking to an equitable adjustment on account thereof."

Upon receipt of this letter plaintiff came to Washington and conferred with the contracting officer about this order and its effect upon increased costs and expenses under the fixed-price contract, and about the matter of payment or reimbursement of all such increased costs by defendant. Plaintiff was told to consult his attorney and submit a draft of a proposed supplemental agreement as to these future operations. Plaintiff did so and many conferences were held in Washington. The agreement proposed by plaintiff was not acceptable. Certain provisions of the agreement finally proposed and insisted upon by defendant and signed by the parties are set out in finding 104. This agreement, so far as material for present purposes, provided:

"14. That reimbursement to the contractor for wages paid to workmen at the site engaged by the contractor or subcontractors, and necessarily expended as a result of the provisions of Article 18, page 4, of this supplemental contract, as restricted by the provisions of section 13 of this supplemental contract, upon vouchers approved by the contracting officer, will be contingent upon the allocation of additional funds for the payment thereof by the Federal Emergency Administrator of Public Works.

"15. That upon the completion of the work called for by the original and this supplemental contract and formal acceptance thereof by the United States, the contractor will file and prosecute a claim for reimbursement of the additional costs and expense incurred and specified in sections 11 and 12 of this supplemental contract: Provided, That nothing herein contained shall operate to prevent the contractor from making and the Government from entertaining a claim for any additional cost or expense incurred as a direct result of the signing of this supplemental contract."

The Comptroller General under the act of June 16, 1934, 48 Stat. 974, 41 U.S.C.A. § 28 et seq., enacted in the meantime, reimbursed plaintiff for only the increased wages paid to common and skilled labor and denied reimbursement for the items of the claim here in suit.

The first two items in suit are for increased intermediate wage rates paid and increased insurance premiums in the amounts of $3,608.04 and $2,067.82 (findings 101 and 102). These amounts are allowable and are conceded by defendant. Defendant also concedes that $602.60 is due plaintiff for increased cost of certain tile and terrazo material (finding 104).

The next item is for $171.28 for increased cost for certain louvres (finding 103). The evidence shows that this increased cost was due to the N.I.R.A. and the supplemental agreement, and plaintiff is entitled to recover this sum.

The next item (finding 106) is for $240 representing two weeks' salary of plaintiff's general superintendent, and is claimed as an expense chargeable to the

N.I.R.A. and the supplemental agreement because the Superintendent spent two weeks in converting and organizing the work under that act and the agreement. The facts are admitted but the facts do not show this salary was an expense which would not have otherwise been incurred. During said two weeks' period the superintendent was also performing his other duties and his salary was not therefore entirely attributable or chargeable to the Recovery Act and the supplemental agreement. Plaintiff is therefore not entitled to recover this item.

The next claim is for additional clerk hire (finding 107) in the total amount of $2,370.00. This was an additional expense which was occasioned by and resulted from enactment of the Recovery Act and the making of the supplemental agreement. Plaintiff is therefore entitled to recover this amount of $2,370.00.

The last two items of the claim (finding 108) are for $2,500 attorney fee and $250 traveling expenses. These increased costs were reasonable and were incurred and paid in connection with and by reason of defendant's order of September 14, that all operations under the contract be converted to a Public Works Administration operation under section 206 of the National Industrial Recovery Act, 40 U.S.C.A. § 406, and the rules, regulations, and instructions of the Emergency Administrator of Public Works. Under that order, which was incorporated in the supplemental agreement, the contracting officer promised an equitable adjustment for increased costs and expenses, and paragraphs 14 and 15 of the supplemental agreement above quoted, while not specifically agreeing to pay plaintiff's increased costs and expenses out of N.I.R.A. or other funds, did not deny his equitable right to reimbursement therefor. The provisions did specifically provide for the presentation and prosecution of such claims. The proviso in par. 15 included expenses such as are here involved in the claims contemplated by that section. The letter of September 14 promised an equitable adjustment but it was later found that the N.I.R.A. funds were not available for that purpose.

We think these additional costs are recoverable. The defendant changed and rewrote the original contract in many particulars. The change so ordered, certain details of which were subsequently agreed upon, was the direct result of the enactment of the Recovery Act, and the expenses in question reasonably and necessarily followed from defendant's action on September 14. These expenses were directly attributable to the change ordered by defendant and would not have been incurred except by reason thereof. It was natural for plaintiff, upon receipt of the order of September 14, to desire that a more definite arrangement or understanding be had about the several matters involved, and when the contracting officer suggested that plaintiff consult his attorney and submit a draft of a proposed arrangement as to operations and reimbursements he did so. After many conferences the supplemental agreement of November 9, 1933, was signed as the best arrangement plaintiff could secure.

On the facts and for the reasons stated, we are of opinion that plaintiff is entitled to recover these two amounts of additional expenses totaling $2,750 which were caused by defendant, and which would not have been incurred except for the contracting officer's order of September 14, 1933, and the necessity for the supplemental agreement of November 9.

Judgment will be entered in favor of plaintiff for $23,572.93. It is so ordered.

WHALEY, Chief Justice, and JONES and WHITAKER, Judges, concur.

MADDEN, Judge, took no part in the decision of this case.