**COPCO STEEL & ENGINEERING CO.**

**v.**

**The UNITED STATES.**

**No. 196–62.**

United States Court of Claims.

Feb. 19, 1965.

Robert J. Bird, Washington, D. C., for plaintiff. John L. Carey, So. Bend, Ind., Bird & Thompson, Washington, D. C.,

and Oare, Thornburg, McGill & Deahl, So. Bend, Ind., of counsel.

Edgar H. Twine, Washington, D. C., with whom was Asst. Atty. Gen., John W. Douglas, Washington, D. C., for defendant.

Before COWEN, Chief Judge, and LARAMORE, DURFEE, DAVIS and COLLINS, Judges.

PER CURIAM.

This case was referred pursuant to Rule 54(b) to Trial Commissioner Saul Richard Gamer with directions to make his recommendation for conclusion of law on plaintiff's motion and defendant's cross-motion for summary judgment. The commissioner has done so in an opinion filed October 5, 1964. No exceptions or request for review of the commissioner's opinion and recommendation have been filed and the time for so filing pursuant to the rules of the court having expired, the case is submitted to the court without oral argument according to Rule 55(b) (3) (iii). Since the court is in agreement with the opinion and recommendation of Trial Commissioner Gamer, as hereinafter set forth, it hereby adopts the same as the basis for its judgment in this case. Plaintiff is therefore not entitled to recover. Defendant's cross-motion for summary judgment is granted, plaintiff's motion is denied, and plaintiff's petition is dismissed.

The Chief Judge concurs in the granting of defendant's cross-motion for summary judgment on the first ground stated in Trial Commissioner Gamer's opinion.

OPINION OF COMMISSIONER

Plaintiff's contract [1] with the Ordnance Corps, Department of the Army (Pica-tinny Arsenal, Dover, New Jersey), for the manufacture of 38 "Containers T 315",[2] incorporated a price redetermination article. The original contract price, as amended, was $67,820.79. The contracting officer subsequently determined that $41,925.32 constituted a fair and reasonable price (which allowed a 15 percent profit) and, following plaintiff's refusal to make a voluntary refund, withheld from payments otherwise due under the contract and from a series of others that plaintiff had with defendant the difference of $25,895.47.[3] The Armed Services Board of Contract Appeals, in an 11–5 decision, upheld the contracting officer's action and plaintiff, contending it is entitled to the full contract price, sues to recover the withholdings.

At a pretrial conference, the parties agreed that there was no material dispute concerning the facts and that the legal issues involved could be determined on the basis of the facts as found by the Appeals Board. These issues are now presented for resolution on plaintiff's motion and defendant's cross-motion for summary judgment.

Plaintiff's case rests on the contention that the price redetermination article is, under the circumstances, not applicable to it at all. It says that if the Government desired to invoke the article, it was required by the specific terms thereof to give plaintiff a timely written demand, which it failed to do.

The pertinent provisions of the article read as follows:

"Article 35—*Price Redetermination.* (a) Within sixty days after the completion or termination of this contract, the Contractor will submit to the Contracting Officer a detailed statement of the costs of performing this contract. Upon the written demand of the Contracting Officer,

1. The contract had been entered into with the Edwards Iron Works, Inc., an Indiana corporation, which was wholly owned by plaintiff. During performance, plaintiff caused Edwards to be dissolved and its business thereafter was conducted as a division of the plaintiff, plaintiff as-suming all of its assets and liabilities and continuing to perform all of its contracts.

2. This is a device which is designed to contain air under pressure.

3. The costs were determined to be $36,-456.80. 15 percent profit thereon would be $5,468.52.

made at any time within thirty days after the submission of such statement, the Contractor will negotiate to reduce the contract price to an amount representing fair and reasonable compensation for the performance of the contract. * * *

* * * * * *

"(c) If within thirty (30) days after the making of such demand (or such further period as may be fixed by written agreement) the Contracting Officer and the Contractor fail to agree to a redetermined price (which term, for the purpose of this clause, shall include direct costs, indirect costs and profits,, the failure to agree shall be a dispute concerning a question of fact within the meaning of the clause of this contract entitled 'Disputes.'

"(d) The Government shall retain from amounts otherwise due the Contractor, or the Contractor shall repay to the Government if paid to him, any amount by which the contract price is found as a result of the application of this clause to exceed a fair and reasonable price, as the Contracting Officer may direct."

The final shipment, consisting of 14 containers, was received by defendant on March 4, 1955. On March 10, 1955, auditors of the Army Audit Agency arrived at plaintiff's place of business to audit plaintiff's books and records on this contract and to determine plaintiff's costs and profit. The audit took approximately 2 weeks. During this period plaintiff, by letter of March 18, 1955, forwarded a detailed cost statement to defendant which it stated it was submitting "in accordance with article No. 35 of this contract." By letter of March 22, 1955, defendant's price analyst (evidently the letters having crossed) requested plaintiff to submit cost data "in accordance with the provisions of Article 35 of the subject contract." By letter of the same date, March 22, 1955, plaintiff supplemented its March 18 statement by a corrected figure, showing, according to plaintiff's calculations, its costs to be

$37,356.77, and leaving it with a profit of $30,464.02. Since this indicated an abnormally large profit of over 80 percent, plaintiff, on March 24, 1955, sent a long letter attempting to justify its position that it be permitted to retain the full contract price. However, the only written demand under the article requiring the contractor to negotiate to reduce the contract price was not made by defendant until June 14, 1955. Manifestly, this was not made "within thirty days after the submission of such statement" (it was almost 3 months later), and would, on this basis, be untimely.

Defendant, however, supports the timeliness of the June 14 demand by contending that the contract can not be considered to have been completed until May 18, 1955, and that plaintiff's submission of the cost statement (and defendant's request therefor) in March was therefore actually premature, Article 35 (a) requiring that the statement be submitted "*after* the completion of" the contract (emphasis supplied). The May 18 date should, defendant contends, therefore be considered as the effective date of the submission of the cost statement. On that basis, its June 14 demand, made within 30 days after May 18, would be timely.

The grounds for defendant's contention that the contract should not be regarded as having been completed prior to May 18, 1955, despite the final delivery made on March 4, 1955, are as follows:

By letter of April 4, 1955, defendant notified plaintiff that one container in a lot of 10 which defendant had received on February 23, and one in the last lot received on March 4, were defective (by reason of air test failure) and therefore rejected. The letter requested plaintiff to furnish shipping instructions for the return of the two containers. By letter of April 29 (plaintiff's delay in replying is unexplained), plaintiff gave the necessary shipping instructions for their return, stating that it would put them in proper condition. By letter of May 10, plaintiff, not having heard further from defendant and not having received the

containers, made inquiry about the matter. Subsequently, by letter of May 24, defendant advised that, because of urgent need, it had decided to make the necessary repairs itself and to accept both containers. Defendant had in fact formally accepted the two containers on May 18. Although defendant had, as a result of the rejection, withheld payment for the two containers, deducting amounts with respect thereto from plaintiff's invoices, plaintiff was advised, by letter of May 26, 1955, to resubmit invoices covering them and payment was ultimately made for them in full, without plaintiff's being charged for the cost of any repairs.

After a price redetermination conference on June 7, 1955, during which plaintiff raised for the first time the question of whether defendant was precluded from redetermining the contract price because it had made no written demand to negotiate within 30 days after plaintiff had submitted its cost statement in March, defendant, by letter of June 14, 1955, then made such a formal demand. This letter took the position that "the contract was not physically completed until final acceptance by this Arsenal of the containers on 18 May 1955" and that, therefore, "less than 30 days have elapsed since the completion of the contract."

On this issue, it seems plain that defendant is correct. Certainly in a supply contract such as the instant one which contains specific provisions with respect to inspection, acceptance of the articles, and payment only upon acceptance, a contract can not be considered to be "completed" immediately upon the contractor's unilateral act of shipping out the final articles. Obviously some reasonable amount of time must be allowed the Government to inspect and test the articles and to make a determination concerning their technical compliance with the specifications.

Article 5 of this contract, headed "Inspection", in terms provides that: "All supplies * * * shall be subject to inspection and test by the Government * * * prior to final acceptance"; that "In case any supplies * * * are defective * * * the Government shall have the right either to reject them * * or to require their correction"; and that "Final acceptance or rejection of the supplies shall be made as promptly as practicable after delivery * * *." And Article 7, "Payments", provides that the contractor shall, upon the submission of proper invoices or vouchers, be paid the contract price for the "supplies delivered and accepted." Certainly under such provisions, mere delivery alone does not effect contract completion. Where, as here, the problem is the amount of the contractor's total costs and profits, how could it be determined with assurance what such costs were until final acceptance crystallized them? Justifiable rejection of any article would necessarily serve to keep the contract open and could well cause the expenditure of further amounts.

No case involving a supply contract with similar test, inspection, and acceptance provisions has been cited which sustains the proposition that a contract is "completed" immediately upon delivery by the contractor of the last articles. On the other hand, several cases in this court, addressing themselves to the problem of when a contract, which has specific inspection and acceptance provisions, is considered to be complete, speak in terms not only of final delivery, but also of acceptance. Pink, Liquidator v. United States, 85 Ct.Cl. 121 (1937),[4] cert. denied, 303 U.S. 642, 58 S.Ct. 641, 82 L.Ed. 1102 (1938); Holton, Seelye & Co. v. United States, 65 F.Supp. 903, 106 Ct.Cl. 477 [5] (1946); Pennsylvania Coal & Coke

---

4. "It has been repeatedly held by this court that, under a contract to perform work, the completion and acceptance date starts the statute [of limitations] to run." (p. 124.)

5. "* * * so far as the plaintiff's obligation to respond to further orders for work was concerned, the contract was not completed until defendant had given its acceptance to that effect." (65 F..

Corp. v. United States, 70 F.Supp. 136, 108 Ct.Cl. 236 [6] (1947).

"Where a contract contains no provisions that indicate that all work which may be required by the Government under the contract shall be regarded as completed only when formally accepted, the claim accrues when the work is in fact completed or the services called for have been fully performed, but where, as here, the contract contemplated and provided not only for completion of the work in accordance with all terms of the contract and specifications but for acceptance of it as complete, the contract is not to be regarded as having been entirely completed until the work performed thereunder is accepted by the Government in full satisfaction of all requirements of the contract." Holton, Seelye & Co. v. United States, supra, 65 F.Supp. at p. 907, 106 Ct.Cl. at p. 500.

Indeed, where the contract contains "Payment" provisions similar to those herein involved, there have been situations where the completion date has been held to be even subsequent to final acceptance, i. e., the date of the presentation of the final voucher. Such a situation would be one where decisions on questions arising under the contract had

not yet been finally made even though the work had been accepted, so that the amount due plaintiff under the contract could not be determined. Austin Engineering Co. v. United States, 88 Ct.Cl. 559 (1939); B–W Construction Co. v. United States, 100 Ct.Cl. 227, 235 (1943); McWilliams, Trustee v. United States, 138 F.Supp. 863, 134 Ct.Cl. 330 (1956).

Although defendant makes no contention that the date of plaintiff's submission of its final voucher after defendant's determination not to make any deductions with respect to the two containers should be treated as the completion date,[7] certainly the final acceptance date of May 18, 1955, would here be the earliest appropriate completion date.

True, the above Court of Claims cases involved the question of when the contracts were to be considered complete for statute of limitation purposes (the contractors in those cases, unlike the instant contractor, argung for late completion dates in order to save their causes of action). However, for final cost determination purposes, the acceptance date, which normally signals the end of the necessity of incurring further production costs, is as valid a date as for statute of limitation purposes.[8]

---

Supp. p. 906, 106 Ct.Cl. p. 498.) "Until such acceptance the contract could not be regarded as having been completed, for until final acceptance the defendant might still have required other work of plaintiff." (65 F.Supp. p. 907, 106 Ct.Cl. p. 501.)

6. " * * * under a contract to perform work the completion thereof and its acceptance are what start the statute to run." (70 F.Supp. p. 140, 108 Ct.Cl. p. 247.)

7. Such a contention could with reason be made. It was not until defendant advised by letter of May 26, 1955, that it would pay in full for the two previously rejected containers that plaintiff actually knew what its total costs would be. $3,560.70 had previously been deducted from submitted vouchers because of the rejected containers. After the ultimate decision to accept them, however, the let-

ter of May 26 was sent to plaintiff advising it to submit an invoice for $3,560.70 to cover said full amount. It was also advised to submit an additional invoice of $167.68 to cover an air express charge that had been properly incurred by plaintiff in expediting the shipment of two containers.

8. Other courts have also held the acceptance date to be the completion date for other purposes, such as for the filing of claims for material furnished. See Pacific Sewer Pipe Co. v. United States Fidelity & Guaranty Co., 185 Cal. 515, 197 P. 332 (1921), where the court stated: " * * * acceptance constitutes the determining factor as to completion. * * * Since the consummation of the work is a matter of conjecture until the actual acceptance thereof, only the approval of the authority whose acquiescence is required * * * can confer the stamp of finality." (197 P. at p. 333.)

That defendant commenced its audit shortly after its receipt of the final shipment, that plaintiff submitted its cost statement while the audit was in process, and that defendant requested such a statement, all in March and prior to the final acceptance in May, are essentially irrelevant. Setting audit machinery in motion in advance is not uncommon. None of these events can be deemed to be a recognition by defendant that the contract had actually been "completed", or to constitute a waiver of defendant's right to test the articles for contract compliance. Should inspection lead to acceptance without the incurrence of further contract costs, the audit work and cost compilations would then turn out to have been completed in advance. Should, however inspection lead to rejection and further incurrence of costs, such supplemental costs could normally be added to the costs already audited without difficulty. These initial audit steps all occurred prior to the rejection of the two containers.

Nor is of any essential significance defendant's decision to effect the repairs itself instead of taking the time to return the containers to plaintiff, as well as its further decision not to charge plaintiff for the repair costs (the basis of such waiver on defendant's part does not appear in the record). There is nothing to indicate that these were not legitimate decisions within defendant's prerogative to make. As such, they could only serve to benefit plaintiff. The fact that, as a result of such decisions, it turned out that the costs as set forth on plaintiff's original cost statement remained unchanged is immaterial. Until such determinations, this was uncertain and unknown. As the court specifically noted in Holton, Seelye & Co., supra, a contract cannot be regarded as complete prior to final acceptance because "until

The doctrine of substantial performance as it relates to the time for filing liens, as set forth in Fox & Co. v. Roman Catholic Bishop of the Diocese of Baker City, 107 Or. 557, 215 P. 178 (1923), and upon which plaintiff relies,

final acceptance the defendant might still have required other work of plaintiff." (65 F.Supp. p. 907, 106 Ct.Cl. p. 501.)

On this "completion of the contract" issue, the Appeals Board sustained plaintiff's contention that the contract was completed upon final delivery on March 4, and plaintiff contends that this is a factual finding which is binding on this court. True, the parties accept the Board's factual findings, thus eliminating any fact disputes. The issue here is when, under the undisputed facts, "the completion of" the contract took place within the meaning of Article 35(a). Plainly this is a question of contract interpretation. As the Board itself noted: "The determination of this issue depends upon when the contract requires the demand to be made." This court has held many times that such a question of contract interpretation is one of law concerning which the Board's decision has no binding effect. See Beacon Const. Co. v. United States, 314 F.2d 501, 161 Ct.Cl. 1 (1963) and W. H. Edwards Eng. Corp. v. United States, 161 Ct.Cl. 322 (1963), and cases therein cited.

The Board concluded that the contract should be considered to have been completed by March 4, 1955, when the last items were delivered, because all the containers "were ultimately accepted by the Government on 18 May 1955 without additional work or costs in performance by appellant [plaintiff]." This is the full extent of its discussion and decision on this point. No supporting authority is cited. In the face of the cases abovementioned, particularly Holton, Seelye & Co., supra, which holds the factor of non-incurrence of further expenditures after final delivery to be immaterial, the Board's conclusion can not be accepted.

But even if it be held that defendant's June 14 negotiation demand

is not contrary in view of the court's holding that, despite subsequently discovered defects, the building would be deemed to have been completed when accepted.

was untimely, the ultimate result would be the same. For it is plain that in any event, plaintiff, by its conduct, made unnecessary the serving of the written demand referred to in Article 35(a). In so holding, and in consequently denying plaintiff's appeal, the Appeals Board was clearly correct.

The facts pertaining to this issue are as follows:

As shown, plaintiff's original cost statement showing a huge contract profit was, shortly following the final delivery on March 4, 1955, forwarded to the contracting officer by letter of March 18, 1955. In the letter plaintiff admitted that the statement did "reflect an abnormal profit" but went on to explain that such profit only followed the experience plaintiff gained in producing the original proto-type models on which plaintiff had suffered a loss, and that that loss "should be taken into consideration at the time of the final negotiation on the above referenced contract where profit is being considered." It advised it would submit a separate statement showing the loss it sustained on the proto-type models, and that "If there are any further requirements we know you will advise * * *."

Thereafter, after first submitting, on March 22, 1955, slightly revised total contract price and profit figures, plaintiff, on March 24, 1955, sent the contracting officer its cost breakdown on the original proto-type models together with a long letter (by the authorized president of its subsidiary, which had actually entered into and performed the contract) explaining what it contended constituted a substantial loss on such models. Plaintiff stated that these "were the costly pioneers that blazed the path making those that followed much easier", and that the containers on the instant contract "received the full benefit, without cost, of existing tooling in our plant which was built and designed by us for the proto-type units." It explained how its accounting method of "only apportioning average plant manufacturing burden to the job" caused the loss on the proto-type contract, as it appeared on the

enclosed cost breakdown, to be much smaller than it actually was. It further pointed out the "alarming[ly]" small profit it had realized in 1954 from its gross overall business and attributed the situation to the substantial amount of Government work it was performing at only a "minor" profit which, "if a true departmental and assignable manufacturing burden and G & A [General and Administrative] overhead could have been applied to this government work instead of plant average, it conceivably could have put these past government contracts at a break even point at best, or a loss." And on its then current 1955 work, plaintiff pointed out that the situation was even worse, and that on one Government contract it was suffering "a terriffic loss, far in excess of the profit shown on" the instant contract. It argued that "because all contracts concerned are the property of the U.S. Government it would seem in the interests of equity and fairness they should be considered together", and that if the full profit on the instant contract would not be allowed, its relatively small profits earned on its January and February gross business would be converted "into a loss." The letter closed by stating:

"These incidents, we know, must be very trying to you and we will be most grateful for consideration on this issue. We do feel, with deep and sincere conviction, that there is justification in our profit figures on these units and realize you will give all factors their proper analysis.

"I would welcome being asked to visit your office for a further discussion if practical and would anticipate a pleasure in meeting you."

After this letter came the above referred to rejection by defendant on April 4, 1955, of the two containers, the deductions therefor from previously submitted invoices, their subsequent repair by defendant itself and acceptance on May 18, 1955, defendant's letter of May 24, 1955, informing of the acceptance, and defendant's letter of May 26, 1955, advising plaintiff to submit an invoice on the two

containers in order to receive payment for them in full (as well as another invoice for an air express charge to which plaintiff was entitled).

On May 19, 1955, the day following the acceptance, without deduction for repair costs, of the two previously rejected containers, defendant's price analyst telephoned the president of plaintiff's subsidiary in South Bend, Indiana, to request that he come to the Picatinny Arsenal in Dover, New Jersey, to attend a meeting with defendant's officials to negotiate on the instant contract with respect to price redetermination.[9] Plaintiff's official had no objection to the meeting. Indeed, he had, as shown, actually requested it, stating in his lengthy March 24, 1955, letter to the contracting officer that he "would welcome being asked to visit your office for a further discussion * * *." The meeting was set for June 7, 1955.

On that day, the meeting was held at the Arsenal, plaintiff being represented by the president of its performing subsidiary and his comptroller, and defendant by its contracting officer and price analyst, among others. The meeting opened with a discussion, led by defendant's price analyst, of plaintiff's costs as determined by the Army Audit Agency, including certain items questioned or disallowed by the auditors.

After the Government completed its statement and explained its position, the president of plaintiff's subsidiary then for the first time contended that defendant had failed to make a timely written demand for negotiation and that the telephonic verbal request of May 19, 1955, had placed plaintiff under no obligation to negotiate.

However, plaintiff's official did, without prejudice to his position, continue the discussion. He and his comptroller entered into a detailed explanation of each questioned or disallowed item. All cost differences were ultimately resolved and figures arrived at which were acceptable to both sides.[10] However, because of his position, plaintiff's official made no binding commitment to a redetermined price, stating that he wished to consult the home office of the parent company (the plaintiff) and particularly its attorney with whom he had consulted before the meeting.

On June 14, 1955, plaintiff's official advised the contracting officer by telephone that, after further consultation with the parent company's attorney, plaintiff concluded it was not subject to the price redetermination because of defendant's failure to make a timely written demand to negotiate, and that plaintiff would not, therefore, make a voluntary refund. On the same day, defendant sent its aforementioned negotiation demand, coupled with the refund demand. Upon plaintiff's refusal, by its letter of June 24, 1955, to make such refund, the contracting officer, by letter of June 28, 1955, made formal findings of fact fixing a fair and reasonable price.

Under these circumstances, it seems plain that plaintiff, by its conduct, made unnecessary the service upon it of a formal written demand to negotiate under Article 35. Plaintiff had, by its very first letter of March 18, in effect itself opened up the negotiations in an abnormal profit situation in which it obviously had no doubt that it would be called upon to negotiate. It did not wait for such call. Evidently considering this the better strategy, it itself made the first move and attempted, by that letter and the further lengthy letter of March 24, to persuade defendant to permit it to retain the large profit which it knew defendant's auditors were currently in the process of ascertaining and for which it would surely be called to account. Its

9. That this request was not made prior to the acceptance date but was instead promptly made on the very next day following acceptance supports defendant's contention that it did not consider the contract to be complete until such date.

10. On the basis of such cost figures, the full, unredetermined contract price would give plaintiff a profit of 86 percent on the contract.

March 18 letter urged that the prototype contract loss be considered "at the time of the *final* negotiation" (emphasis supplied) and gave assurances of its readiness to supply any additional data. And it closed the March 24 letter by in effect requesting the opportunity "for a further discussion" of the matter by a personal visit to defendant's offices.

The Appeals Board was manifestly correct in holding that, while "the submission of costs for the express purpose of providing a basis for negotiations does not necessarily constitute negotiation or an agreement to negotiate", nevertheless, "The letter of 24 March 1955 * * * was not merely an addition to the cost data already submitted or even an explanation of it. It was a justification of the claim of a profit of more than 80% of the costs shown, and as such it was an argument submitted in anticipation of the demand for negotiation for price redetermination. It was in effect a voluntary entry into negotiations protect a claim which was on its face unjustifiably excessive." The final sentence of the letter said the Board, was "at one and the same time an acknowledgment that the letter was intended as a negotiation and an invitation to the Government to continue the negotiations so commenced."

Certainly defendant would be justified in believing in these circumstances that a formal written notice to negotiate was superfluous.

And when defendant granted plaintiff's request for a negotiation conference and, by the telephone call of May 19 invited plaintiff to come to New Jersey for such "further discussion", there was no objection on plaintiff's part or contention of untimeliness. Under plaintiff's present theory, defendant was by then already out of time. Yet plaintiff's official readily accepted the opportunity to continue the negotiations in person, and came all the way from Indiana to New Jersey for that express purpose.

Moreover, as the negotiation meeting opened and proceeded, there was still no inkling that plaintiff was relying on the lack of a formal written demand to negotiate. Only after the discussions had eventuated into a disclosure of defendant's basic position did plaintiff, for the first time, unveil its untimeliness theory. If there then was astonishment in defendant's ranks at plaintiff's sudden reliance on the lack of a written demand to conduct the very negotiations which were already in process, it can only be said that it would be wholly understandable.

Lack of strict compliance with many kinds of contract requirements concerning writings and notifications have frequently been held to be of no consequence where the conduct of the parties have made it clear that formal adherence would serve no useful purpose or that the parties have in fact waived it. Thompson v. United States, 91 Ct.Cl. 166, 179 (1940) (failure of contractor to assert a claim for adjustment of change order in 10 days waived in view of defendant's later consideration of claim on merits); Guyler v. United States, 314 F.2d 506, 161 Ct.Cl. 159 (1963) (failure of contractor to make a timely 30-day claim for equitable adjustment waived by consideration of claim on merits); Shepherd v. United States, 113 F.Supp. 648, 125 Ct. Cl. 724, 732 (1953) (failure of contractor to give notice of changed condition immaterial in view of defendant's knowledge of the condition); Whitman et al. v. United States, 110 F.Supp. 444, 124 Ct.Cl. 464 (1953) (contract provision that amount of change order be set forth at time of issuance does not preclude recovery where parties adopted a procedure of waiting until completion of contract to determine amounts due); McShain v. United States, 65 F.Supp. 589, 106 Ct.Cl. 280 (1946) (contractor permitted recovery for performance of extra work without formal written change orders where parties adopted procedure of postponing all claims for extras until

completion of job). No reason is apparent why the provision herein involved is not as waivable as those involved in the cited cases.

This waiver by plaintiff of this contract requirement did not represent unique conduct by these parties. There were waivers by defendant too. The final deliveries made by plaintiff under the contract were well beyond the required contract times. Defendant nevertheless waived plaintiff's default by accepting the containers without objection.[11] See Cuneo, Waiver of the Due Date in Government Contracts, 43 Va.L. Rev. 1 (1957). And there was also the waiver of the repair costs on the two defective containers.

Indeed, in Harvey Radio Laboratories, Inc. v. United States, 115 F.Supp. 444, 126 Ct.Cl. 383 (1953), cert. denied, 346 U. S. 937, 74 S.Ct. 377, 98 L.Ed. 425 (1954), the same general doctrine, although expressed in terms of equitable estoppel by acquiescence, was applied to the specific problem herein involved of the failure by the Government, under an identical price redetermination article, to serve a formal written negotiation demand. There too the contractor, after it had already engaged in the price redetermination negotiations, was not permitted, in the midst thereof, suddenly to rely on the defendant's previous failure to serve a written demand to negotiate. As the court there said in language peculiarly applicable to the instant case, " * * * plaintiff was ready and willing to engage in negotiations for price revision, and the contracting officer so understood from plaintiff's actions and expressions"; " * * * it was suggested that negotiation conferences be scheduled on the contract"; and "such a conference was held" although final price redetermination was also not reached thereat because of the plaintiff's sudden position taken during the course thereof concerning lack of a written demand to negotiate. "We are clear that

on the facts of the case" said the court, "plaintiff must be held to have acquiesced in these proceedings, and it is therefore estopped to assert the failure of the contracting officer to perform the condition precedent of making formal written demand to negotiate" (115 F.Supp. pp. 449, 450, 126 Ct.Cl. pp. 392–393).

■ Thus, plaintiff's belated assertion of immunity from negotiation and price redetermination based on lack of a written demand is unavailing. A waiver once made cannot be revoked, and this is so even where there is no specific consideration for the waiver, American Locomotive Co. v. Gyro Process Co., 185 F.2d 316 (6th Cir. 1950), or "any change of position by the party in whose favor the waiver operates." United States Fidelity & Guaranty Co. v. Miller, 237 Ky. 43, 76 A.L.R. 12, 34 S.W.2d 938, 940 (1931).

■ The parties are in dispute as to whether the basis of the Board's decision on his point was "waiver" or "equitable estoppel", and whether such matters are questions of fact concerning which this court is bound by the finality doctrine, or questions of law upon which it is free to make an independent decision. However, the resolution of these questions would make no difference. In itself in effect opening up the negotiations and in inviting defendant to continue them by personal discussions and, upon the acceptance of such invitation, in actually entering into such negotiations, plaintiff's conduct amounted to a waiver of the requirement of a written demand to negotiate. And thereafter, and especially after the Government disclosed its position in the midst of the negotiations, plaintiff should, in all equity, be estopped from relying on the lack of such a demand. True, the Board did not explicitly use either the term "waiver" or "estoppel." However, the Board found plaintiff's "actions", were "in effect a voluntary entry into negotiations to protect

11. The contract required 20 containers to be delivered on or before January 1, 1955, and 18 on or before January 31, 1955.

**600**

a claim which was on its face unjustifiably excessive", and were therefore "such as to render such a demand unnecessary." This, clearly, enunciates a waiver doctrine. Waiver has been described, as " * * * the voluntary act of the party * * *." Williston on Contracts (3d ed. 1961) § 678. And as the Board further held, plaintiff "cannot participate in" the negotiations "until it discovers the likelihood of an unfavorable outcome and then decline to continue." This is estoppel language. Harvey Radio Laboratories, Inc. v. United States, supra. Thus plaintiff is precluded on both theories. If they be regarded as questions of fact, the Board's determination must follow, for they are not only well supported but the parties do not dispute the Board's factual findings. And if they be regarded as questions of law, the Board's decision was, upon the independent consideration herein given it, manifestly correct.

In summary, it must be concluded that plaintiff was subject to price redetermination because the written demand which defendant served upon it to negotiate with respect thereto was timely. Furthermore, even if it was untimely, plaintiff, by its conduct, waived the necessity for such a demand and became estopped from disclaiming its waiver.

In view of these conclusions, it is not necessary to consider defendant's further contention that, even if plaintiff is upheld on the above two issues, it should still not be permitted to recover because such a recovery would effect an impermissible forfeiture.

There is no issue here between the parties concerning the reasonableness of the price redetermination, nor was there before the Appeals Board. The sole issue is whether, under the circumstances, plaintiff is subject to such redetermination at all. Since this issue is decided adversely to plaintiff, plaintiff's motion for summary judgment should be denied, defendant's cross-motion granted and plaintiff's petition dismissed.