## PENNSYLVANIA COAL & COKE CORPORATION v. UNITED STATES.
### No. 46367.

Court of Claims.
March 3, 1947.

T. Bruce Fuller, of Washington, D. C. (Theodore Granik and C. G. Engling, both of Washington, D. C., and Charles E. Cotterill, of New York City, on the brief), for plaintiff.

D. B. MacGuineas, of Washington, D. C., and John F. Sonnett, Asst. Atty. Gen. (William A. Stern II, of Washington, D. C., on the brief), for defendant.

Before WHALEY, Chief Justice, and LITTLETON, WHITAKER, JONES, and MADDEN, Judges.

JONES, Judge.

Plaintiff's claim arises out of the sale and delivery by it to defendant of certain quantities of coal in 1939, for which it contends it has not been paid in full. By virtue of a stipulation entered into between the parties subsequent to the filing of plaintiff's petition it is agreed that judgment in the amount of $22,000 may be entered in favor of plaintiff, in full settlement of all matters involved in this case, provided plaintiff's claim is not barred by the statute of limitations applicable to claims filed in this court. The sole issue for our determination, therefore, is whether plaintiff's petition was filed within six years after the claim first accrued, as required by section 156 of the Judicial Code, 28 U.S.C.A. § 262.

Under date of June 30, 1938, plaintiff entered into contract No. TPS-23545 with defendant whereby plaintiff agreed to sell and deliver coal to the Procurement Division of the United States Treasury Department, in accordance with a written schedule which set out in detail the quantity and kind of coal to be delivered each month during a 12-month period beginning in July 1938 and ending the following June. The contract initially ran for a period of 30 days beginning July 1, 1938, but there was reserved to defendant the right to renew the contract for successive 30-day periods during the remainder of the fiscal year ending June 30, 1939, and plaintiff executed a performance bond covering all coal to be delivered by it during said year in accordance with said schedule. From time to time throughout the fiscal year ending June 30, 1939, by written notification to plaintiff prior to the expiration of each particular 30-day period, defendant renewed the contract for successive 30-day periods. Thus, under date of February 20, 1939, defendant notified plaintiff of the amendment of that portion of its contract covering run-of-mine coal (previously extended through February 25, 1939), by letter containing the following language:

"The above purchase order is hereby further amended to increase the number of units from approximately 34,000 tons to 39,000 net tons of coal at $4.468 per ton, and the extension amount from $151,912.00 to $174,252.00.

"The expiration date notice on the order is to be changed to read as follows: 'Expiration date of ninth 30-day contract period is March 27, 1939, and contract may be further extended in accordance with paragraph 9 of Schedule No. 1 of Invitation No. 13748–C–5–5–38, opened May 5, 1938.' "

Similar notices were given to plaintiff on the same date, with reference to the other types of coal it had agreed to furnish pursuant to the terms of Schedule No. 1 of the contract. Ultimately the twelfth or final renewal of the contract extended the expiration date to June 25, 1939. The last shipment of coal was on September 29, 1939, and the last remittance from defendant was received by plaintiff on October 24, 1939.

Upon making each shipment of coal plaintiff sent an invoice to defendant giving the details of shipment, the quantity, grade and price of the coal covered by the invoice, and the amount of money due thereunder. Contract No. TPS-23545 contains the following provision with reference to payment for coal delivered by plaintiff:

"Payments: The contractor shall be paid upon the submission of properly certified invoices or vouchers at prices stipulated herein for coal delivered and accepted. Unless otherwise specified, payments will be made on deliveries accepted by the Govern-

ment when the amount due on such deliveries so warrants: Provided, That when requested by the contractor payments for accepted partial deliveries shall be made whenever such payments would equal or exceed either $1,000 or 50 percent of the total amount of the contract. When samples are taken, as provided in paragraph 16, 10 percent of the amount due may be withheld pending the outcome of the analyses of the samples."

By March 11, 1939, plaintiff had made some hundreds of different shipments of coal to defendant, and had received from defendant a considerable number of remittances of varying amounts, aggregating many thousands of dollars. A comparison of the dates and amounts of each shipment made by plaintiff with the dates and amounts of each payment received by plaintiff (finding 12) fails to indicate any regular pattern of payment employed by defendant based either upon the dates of the shipments from plaintiff, or the amounts thereof, or otherwise. There is no evidence that any settling of accounts between the parties, periodic or otherwise, had occurred prior to March 11, 1939. On that date the coal delivered by plaintiff to defendant in accordance with the contract, for which plaintiff had not then been paid, amounted to $116,807.05.

Some time not later than March 21, 1939 (the proofs submitted do not permit finding a more exact date) plaintiff received from defendant a check for $9,122.30, dated March 11, 1939, and issued pursuant to Public Voucher No. S35322. Attached to this voucher, and listed thereon for payment were nineteen of plaintiff's invoices, aggregating in amount $33,662.32, for a portion of the coal which plaintiff had delivered to defendant during the period from February 6, 1939, to February 22, 1939. The figure of $9,122.30 was computed on the Government voucher by deducting from the amount representing plaintiff's invoices the sum of $24,540.02, to cover certain payments made to plaintiff in 1938 under a previous contract, which payments defendant in the meantime had concluded were unauthorized and hence sought to recoup.

Defendant does not attempt in the present proceeding to obtain a judicial determination of the propriety of such deductions, but concedes that, if plaintiff's claim has been timely filed, judgment may be entered against defendant for $22,000.

Whether or not any previous discussion had occurred between plaintiff and defendant concerning the repayment of such amounts prior to defendant's action in March 1939 does not appear in the record. So far as the evidence shows, the charging of plaintiff's account was a purely unilateral act on the part of defendant, accomplished by the taking of a deduction on the face of the voucher, with a memorandum on the reverse side thereof that the deduction was "for overpayment in accordance with Comptroller General's Decisions A–93507 and A–93379 dated April 25, 1938, $24,540.02." On March 21, 1939, plaintiff wrote defendant that "we do not assent to the correctness of the deductions nor do we accept the check as full payment," to which defendant shortly thereafter replied that:

"* * * the acceptance of the check * * * issued in connection with the settlement will in no way jeopardize any future claim that you may wish to present."

On April 4, 1939, plaintiff presented its claim for $24,540.02 to the Comptroller General, who denied the claim on September 14, 1939. Plaintiff, having received payment for all coal shipped under the contract except for the $24,540.02 so retained, filed its original petition in this court for such sum on March 16, 1945. It follows that if plaintiff is to prevail in this proceeding its claim must not appear to have first accrued prior to March 16, 1939. Kendall v. United States, 14 Ct.Cl. 122.

In undertaking to resolve this issue the court is confronted with a factual situation in which it has received a minimum of help from the record. Notwithstanding the fact that plaintiff's petition was filed just six years from a day exactly midway between the date (March 11, 1939), appearing on the $9,122.30 check which accompanied defendant's Public Voucher No. S35322, and the date (March 21, 1939), of the letter from plaintiff to defendant in

which the deductions shown on the voucher were protested, and the retention of the check disclaimed as payment in full, neither party has established definitely the date on which plaintiff received such check and voucher, so as to evidence receipt of knowledge on the part of plaintiff that defendant was withholding certain coal payments in order to reimburse itself for earlier payments it had concluded were improper. Counsel for both sides in taking testimony apparently skirted around this question as if afraid something would fall on them.

The court is left to conjecture whether plaintiff did or did not have actual knowledge on March 16, 1939, of defendant's treatment of certain of plaintiff's invoices as settled and paid by means of the deductions shown on the voucher. We have found the record devoid of anything upon which we might base an affirmative finding of fact either that the check and voucher were received by plaintiff prior to, or not until on or after, March 16, 1939. It is stated in plaintiff's brief that the check was received by plaintiff on March 21, 1939, and a portion of the brief is devoted to an argument premised upon such statement being accepted as a fact. However, it was not proven as a fact by any direct testimony. The only thing in the nature of proof bearing on this question as to when the check and voucher were received by plaintiff is a stipulation in the record by defendant that certain allegations in the petition were true, including the allegation that the president of the plaintiff "on March 21, 1939, *upon receipt of the check,* addressed a communication to the Procurement Division [italics supplied]." In this we find neither an allegation by plaintiff nor an admission by defendant that plaintiff did not receive the check prior to March 21, 1939. If, as will appear at a later point in this opinion, the same result is reached as would have followed had such fact been affirmatively established, it is not because plaintiff has shown it affirmatively to be so, but rather because defendant has failed to show that it had mailed or delivered or that plaintiff had received the check and voucher at an earlier date not within the six years immediately preceding the filing of plaintiff's petition.

Because both plaintiff and defendant in portions of their arguments have undertaken to resolve the question as to when plaintiff's claim first accrued without any consideration whatsoever as to when the check and voucher were received by plaintiff, we shall give our attention to their respective contentions in this regard before discussing further what bearing the check and voucher may have upon this question in view of the above state of the proof.

As might be expected we find plaintiff and defendant arguing the respective extremes as to when plaintiff's claim first accrued. Plaintiff contends that the contract to furnish coal to defendant was not divisible but intended by the parties to be but one entire contract as shown by the requirement that plaintiff furnish a performance bond covering all coal to be delivered during the twelve-month period set forth in Schedule 1, and by the provision that partial payments could be made under the contract. Assuming the contract to be entire rather than divisible plaintiff concludes that, upon the authority of such cases as Myerle v. United States, 31 Ct.Cl. 105, and William T. Joplin et al. v. United States, 89 Ct.Cl. 345, it "was not obligated to sue on each item of damage as it might have arisen" and that its claim did not accrue until the completion of the entire contract in October 1939, when the last coal was accepted and paid for under the contract.

As a criterion determining whether plaintiff's contract was entire or divisible, the foregoing cases are scarcely persuasive on their facts, nor do they purport to provide a universal guide as to when the statute shall commence to run for any and all claims which may arise out of a contract not strictly divisible. Each of these cases involved a construction contract in which the contractor subsequent to completion of the contract sought to recover damages occasioned by the Government's delay during the performance of the contract at a time more than six years prior to the filing of the contractor's petition in this court. We held that the contractors having continued to work under the contract, all their claims were bound up with the completion of the project in accordance with its terms,

and that this fixed the time when their cause of action arose, notwithstanding they might have abandoned the project and sued on a quantum meruit for the work done and for damages, when (as in the Joplin case) the Government made evident its intention to stop making payments in accordance with the terms of the contract.

In these cases we simply treated as applicable to claims based upon the defendant's delay the general rule adopted by this court that under a contract to perform work the completion thereof and its acceptance are what start the statute to run. We refused to hold that the statute commenced to run at the time the delay occurred. In Holton (Seelye & Co.) v. United States, 65 F.Supp. 903, 106 Ct.Cl. 477, 499, we pointed out that this rule was based upon and justified by the necessity for avoiding the splitting of causes of action and a multiplicity of suits on various items of a claim arising under an entire contract, and that we did not believe Congress intended that Section 156 of the Judicial Code should be interpreted to require otherwise. However, as we were careful to observe in that case, no fixed rule as to when a claim or cause of action accrues can be stated and applied in every case. The facts and the terms and conditions of the provisions and stipulations of the contract, agreement, or statute in each case must be considered.

Under the facts in the present case we have neither the type of contract nor the kind of claim, nor for that matter, quite the reason for the rule which was applied, in the foregoing cases. Here the contract was one for sale and delivery of various quantities of coal to defendant during a twelve-month period in accordance with a certain schedule which detailed the quantity and quality of coal to be delivered each month. The price was fixed in terms of the units of coal supplied. The claim arose out of defendant's failure to pay plaintiff in full for certain deliveries made during a portion of one of these months. Ordinarily a cause of action would accrue when the service was rendered or when the articles were furnished and the obligation to pay therefor arose. But this is not a hard and fast rule. Manufacturers Aircraft Ass'n v. United States, 77 Ct.Cl. 481, 522. As we there said, if Section 156 of the Judicial Code had been intended definitely to fix the time when the claim should accrue in every case, it would simply have provided that every suit should be commenced within six years after the service was rendered or the articles called for were furnished. Under our view of the language found in Section 156 the question of whether the cause of action in a particular case accrues at such time as goods are delivered and the obligation to pay for them arises, must depend upon the agreement or arrangement between the parties.

In the present case the parties by the terms of their agreement appear to have fixed a different time for the accrual of claims for payment, for the purposes of computing the statute of limitations, than that which might have applied had the contract said nothing about payments. Cf. John P. Moriarty, Inc. v. United States, 97 Ct.Cl. 338, where because the contract for delivery of black earth to the Government was silent as to when payment should be made we held the time for payment must have been intended to be the date of delivery and acceptance by the defendant. The present contract contains a provision as to payment, however, which distinctly negatives any intent by the contracting parties that payment should be due for each shipment of coal on the date of its delivery and acceptance by the defendant. Item 15 of the contract states that "payments will be made on deliveries accepted by the Government when the amount due on such deliveries so warrants." The fair import of this language would seem to be that while plaintiff will not have to wait until completion of the entire contract for payment, it shall have no right to demand payment for each shipment immediately upon its delivery and acceptance by defendant. The defendant expresses its intention to make payments from time to time for coal delivered and accepted by it when in its judgment "the amount due on such deliveries so warrants."

Defendant, while not contending that under the terms of the contract payment was due for each shipment of coal on the date of delivery and acceptance, sug-

gests that in this case each thirty-day renewal period was a separate contract and hence that the statute started running on the present claim on February 25, 1939, the date of the last invoice which defendant undertook to pay by making the deductions appearing on Public Voucher No. S35322 and issuing the check of March 11, 1939. We find nothing in Sanger & Moody v. United States, 40 Ct.Cl. 47, to persuade us that the contract in this case must be divided, for purposes of the statute of limitations, into twelve separate contracts. In the Sanger case the parties, though originally contemplating a single contract for furnishing stone under the public advertisement for bids on a public project, actually entered into three separate contracts and the stone was furnished on that basis; hence recovery on one of such contracts, completed more than six years before the filing of a claim, was barred by the statute of limitations.

In the present case there was one contract, though it was renewed each month for an additional 30-day period throughout the twelve-month period covered by Schedule 1 of the contract. Neither by the terms of the contract, nor by the acts of the parties in the performance thereof, do we find any evidence of an intention that either performance by the seller, acceptance by the buyer, or settlement between the two should be had on the basis of separate monthly periods.

Little is to be gained by attempting to pigeonhole the present contract as entire or severable. A contract may be regarded as "entire" for one purpose, and "severable" for another. See Czarnikow-Rionda Co. v. West Market Grocery Co., 2 Cir., 21 F.2d 309, 312. There is little uniformity to be found in the reported decisions, as may be observed by an examination of the cases reviewed by an annotation in 2 A.L.R. 643, entitled "Contract for sale of goods as entire or divisible." At page 644 the author points out that "the particular right or remedy which presents the ultimate question in the case exerts a very potent and often controlling influence over the courts, in determining whether the contract is entire or divisible" and that "instead of considering the question as to the entirety or divisibility of the contract as an abstract question and then deducing the particular rights or remedies of the parties from the character thus assigned to the contract, the courts in many cases ascribe to the parties an intention, based upon reasonable expectation of what their respective rights or remedies would be in the contingency which has happened, and characterized the contract accordingly." In Franklin v. American Nat. Ins. Co., 10 Cir., 135 F.2d 531, 533, we find the statement:

" 'No formula has been devised which furnishes a test for determining in all cases what contracts are severable and what are entire. The primary criterion for determining the question is the intention of the parties as determined by a fair construction of the terms and provisions of the contract itself, by the subject matter to which it has reference, and by the circumstances of the particular transaction giving rise to the question.' 12 AmJuris., Contracts, § 315. See, also, 17 C.J.S., Contracts, § 332.

"Numerous tests have been declared by the courts and text writers by which to determine whether a contract is severable or entire. In the main, they all declare the general rule that the intent of the parties, as gleaned from the four corners of the instrument, must determine the question."

Defendant contends that if the statute did not start to run at the end of each 30-day period (and so for the purpose of this claim on or prior to February 25, 1939), in any event payment was due (presumably on the $33,662.22 of invoices against which defendant saw fit to make the deductions shown on Voucher No. S35322) not later than March 11, 1939, the date appearing upon the check for $9,122.30 which plaintiff acknowledged receiving under date of March 21, 1939, because of the express provisions of article 15 of the contract. We have some trouble following defendant's argument at this point. The contention seems to be that by March 11, 1939, plaintiff simply must have known that the deliveries made in February had been "accepted" by the Government, else it would have heard from the Government to the contrary, and knowing that invoices for these deliveries

totaled $33,662.22 could not but know that such a sum "warranted" payment. It would be difficult to imagine a more unsatisfactory test as to when a cause of action should be deemed to accrue. Defendant itself has betrayed an inability to fix with any certainty the date upon which the cause of action would first accrue, under this line of reasoning.

The present case is readily distinguishable from that group of cases where recovery is sought on a note or other obligation payable by installments, in which, generally, it is held that the statute of limitations runs against each installment from the time it becomes due. See 82 A.L.R. 316. There was no undertaking or obligation on the part of defendant in the present case to make fixed partial payments at fixed intervals, nor upon the happening of some specified contingency. The provision of the contract that payments would be made "on deliveries accepted by the Government when the amount due on such deliveries so warrants," standing alone could scarcely be construed as so fixing the time of payment that the plaintiff, on the sole basis of such language, could assert a right to be paid some specific part of the price prior to completion of the entire contract, regardless of who might feel that the amount of its unpaid invoices warranted payment. For the right to partial payments currently during the contract year, and for the conditions under which such right vested in plaintiff we must look to the remaining language of the provision covering payments, that "when requested by the contractor payments for accepted partial deliveries shall be made whenever such payments would equal or exceed either $1,000 or 50 per cent of the total amount of the contract." If defendant's position on this point were upheld the quoted proviso would become a meaningless phrase.

Whether we say that the contract is an entire contract for the purpose of the statute of limitations, notwithstanding it contemplates the payment of a more or less definite amount by means of partial payments prior to final completion, or that it is not a divisible contract for purposes of the statute because the parties by their agreement have conditioned the obligation to make such partial payments upon plaintiff's requesting the same when the accepted partial deliveries equal or exceed $1,000 or 50 percent of the total amount of the contract, we must reach the same conclusion, namely, that under the terms of the present contract there was no automatic accrual of claims from day to day, or from month to month, as deliveries called for by Schedule 1 of the contract continued, such as would periodically start the statute running upon any claims for nonpayment of a particular group of invoices. Until plaintiff requested payment defendant could make payments on account or not, just as it saw fit, without being in default under the contract, since the amounts owing from time to time for accepted deliveries could not be said to be due and payable while the time allowed for payment continued, and the contract had not been otherwise breached. Smith Courtney Co. v. United States, 46 Ct. Cl. 262; Manufacturers Aircraft Ass'n v. United States, supra. In the Smith Courtney case, at page 265, 46 Ct.Cl. we stated:

"It has been determined by the Supreme Court and this court, and is in fact elementary, that a right of action accrues and the statute of limitations begins to run when, and only when, the period of credit has expired; or, in other words, when an account is due and payable, or when there is a breach of the contract."

In the absence of any sufficient evidence that defendant's action with reference to charging the $24,540.02 of deductions to plaintiff's account came to plaintiff's attention prior to March 21, 1939, defendant's reliance upon the statute of limitations must be upon the basis that whatever part of the contract price it failed to pay must have become due and payable, not when plaintiff received notice of defendant's action, but immediately upon the doing of the act which was inconsistent with a continuing intent to pay, and upon our assuming from the date on the voucher that such action was taken prior to March 16, 1939. We are unable to find, however, any rational basis for concluding that a right of action accrued to plaintiff automatically upon the taking of this unilateral action by defen-

dant, so as to start the statutory period of time running from that moment.

A situation rather parallel to that which we are here deciding may be found in those cases dealing with the effect to be given the rendition, by banks to their customers, of statements showing credit balances, upon the starting of the statute of limitations in respect of amounts claimed in excess of the balance shown. (See annotation and cases, 87 A.L.R. 344.) The rationale of these cases is well illustrated by what was stated in the principal case there reported, Kansas City Title & Trust Co. v. Fourth Nat. Bank, 135 Kan. 414, 10 P.2d 896, 87 A.L.R. 334, at pages 341 and 343:

"The relation of a bank to its depositor is that of debtor and creditor, and the sum he has on deposit in his checking account is a debt of the bank payable to him on demand; yet, because it is payable on demand, he cannot sue the bank for the amount of his deposit until payment on demand has been made and refused; and such demand and refusal are necessary to set in motion the statute of limitations. But where the bank renders a statement to the depositor showing the status of his checking account, it says to him, in effect: "This bank owes you this stated balance, and no more." Such statement may fairly be construed as a notice that any claim the depositor may make in excess of the stated balance would be resisted by the bank. And in that view of the situation the depositor's formal demand for a greater sum and the bank's formal refusal to pay a larger sum would be unnecessary to perfect the depositor's cause of action, and likewise to set in motion the statute of limitations.

\* \* \* \* \* \*

"We hold that the rendition of a monthly statement to a depositor of the status of his account is fair notice to him of the amount the bank admits it owes him, and that it owes him no more. This practice of rendering monthly statements is born of the necessities of modern banking. They are made for the mutual protection of the bank and its depositor. Such a monthly statement may justly serve as a notice to set the statute of limitations in motion."

The record fails to show that plaintiff had any knowledge prior to March 21, 1939, a date within six years of the filing of its claim, that defendant did not intend to pay some part of the money owing to it for coal delivered when such became due and payable under the provisions of the contract. Until plaintiff received defendant's voucher No. S35322 and its check for $9,122.30, there was no reason for it to insist upon payment of any coal invoices which might then be unpaid, unless it saw fit to do so under the conditions set forth in the contract. When defendant's voucher and check, reflecting the deduction of $24,540.02 from the $33,662.02 owing on plaintiff's invoice, ultimately reached plaintiff it served as a notice from defendant that in paying plaintiff for whatever coal plaintiff had delivered to it the sum of $24,540.02 was to be deducted for payments aggregating such amount theretofore erroneously paid by it to plaintiff. Defendant was not making an issue of plaintiff's right to be paid the full price for the coal delivered under the invoices listed on voucher No. S35322, or any other particular invoices, but it was giving plaintiff notice that it considered plaintiff's account to have been paid to the extent of the deductions so listed, and that it would resist any claim plaintiff might make in excess of the resulting balance.

We know something of the procedure of those who work in government establishments and we know something of their problems. The date of a voucher does not in and of itself establish the date of its final approval or issuance or of the final action on which it is based. This is necessarily true in protecting the interests of a far-flung government. A voucher, which means the expenditure of government money, is usually subjected to review by several officials before the final act of approval and delivery. In no other way can the business of government be safely conducted.

The voucher is dated March 11, 1939. Outside of this date there is no evidence in the record as to when the voucher was finally approved, mailed, or delivered. It would seem natural that plaintiff should protest as soon as it found that $24,500 was

to be deducted from its pay. It meant money out of its pocket. Most men would protest immediately and vigorously and perhaps vociferously. The protest was dated March 21, 1939. But outside of this rather human circumstance there is little in the record to indicate when plaintiff received the notice.

Plaintiff's forbearance from exercising its right under the proviso of article 15 to request payment is entirely consistent with the idea of a temporary extension of credit to defendant, to end which and to cause an immediate accrual of the cause of action would require notice to plaintiff or knowledge of defendant's action in making the deduction.

We find that there is nothing in the record to show that plaintiff knew or was notified of the deduction at any time prior to March 21, 1939, and that there is no satisfactory evidence that the final action approving such deduction was taken before March 16, 1939.

In the state of the record we are not justified in sustaining a plea of limitations against an otherwise admittedly just claim.

The plaintiff is entitled to recover the sum of $22,000. It is so ordered.

MADDEN, WHITAKER, and LITTLETON, Judges, concur.

WHALEY, Chief Justice, took no part in the decision of this case.