## PACIFIC MARITIME ASS'N v. UNITED STATES.

### Nos. 48895, 49003.

United States Court of Claims.

Decided Dec. 2, 1952.

Marion B. Plant, San Francisco, Cal. (Brobeck, Phleger & Harrison, San Francisco, Cal., were on the briefs), for plaintiff.

Mary K. Fagan, Washington, D. C. and Holmes Baldridge, Asst. Atty. Gen., for the defendant.

Before JONES, Chief Judge, and LITTLETON, WHITAKER, MADDEN and HOWELL, Judges.

WHITAKER, Judge.

Plaintiff in these actions, Pacific Maritime Association, is a California non-profit corporation. It is seeking to recover compensation for services rendered by its predecessor corporations to the United States Army in connection with the Army's direct hiring of longshoremen at the San Francis-

co Port of Embarkation during the period January 1, 1942, through July 15, 1946.

The petition in case No. 48895 was filed on October 25, 1948, by the Waterfront Employers Association of the Pacific Coast. The petition in case No. 49003 was filed on behalf of the Waterfront Employers Association of the Pacific Coast and its agent, the Waterfront Employers Association of California[1] on January 27, 1949. Subsequent to the filing of these petitions, the two Associations were consolidated to form the Pacific Maritime Association, whereupon amended petitions were filed setting forth the consolidation and the substitution of parties plaintiff. Both petitions were based upon the same claim, were consolidated for trial under Rule 38(a) of this court, 28 U.S.C.A., and have been treated as one case throughout these proceedings.

The suits are for compensation for furnishing the Army longshoremen to load and unload cargo. Under the terms of contracts between plaintiff or its predecessors and unions representing the longshoremen,[2] a central dispatching hall was organized in each of the West Coast ports, including San Francisco, to conduct the daily hiring and dispatching of longshoremen to employers requiring their services. One-half of the operating expenses of the dispatching halls were paid by the Association and the other half by the Union. A labor pool or registration list of the longshoremen was also established in each port to provide a means of equitably distributing the available work among the longshoremen. The contracts further provided that the Association and the Union should each have an equal voice in the maintenance of the registration list and in the operation of the dispatching halls.

The Association, acting on behalf of its members and certain non-members permitted to obtain longshoremen through the dispatching halls, handled all of the administrative, labor relations, and personnel work, and all of the other employer functions involved in the operation of the labor pools and dispatching halls in each of the ports. In order to carry out these functions, the Association during the period here in question charged employers who received its services 2½ cents per manifest ton of general cargo if they were members of the Association. In the case of non-member employers permitted to use the dispatching halls, the Association's charge was 4 cents per longshore man-hour. From the funds thus received, the Association performed the following services in addition to maintaining and administering the labor pools and dispatching halls: (1) It negotiated and obtained the necessary legal assistance for negotiating the amendments and the renewals of the longshore contracts providing for the continued operations of the labor pools and dispatching halls and fixing the wages, hours, and working conditions under which the services of longshoremen were made available through the halls; (2) At its sole expense it performed all of the accounting and bookkeeping involved in the operation of the halls; (3) It conducted the recruitment and screening of new men necessary to maintain the registration lists at full strength; (4) During World War II it supervised the removal of alien longshoremen excluded from the waterfront area by Government regulation, provided the necessary identification and fingerprinting for the remaining longshoremen, and obtained occupational deferments from the Selective Service of key workers; (5) It organized the registration list to provide various kinds of gangs, extra men, and key personnel, and during World War II furnished special registration cards to men qualified to handle ammunition and high explosives, and supervised the integration of new and untrained men with experienced longshoremen so as to have a trained nucleus in each gang; (6) It conducted an intensive safety and accident prevention program; (7) It handled grievanc-

<hr>

1. The Waterfront Employers Association of California was formed on November 1, 1943, by the consolidation of the Waterfront Employers Association of San Francisco and the Waterfront Employers Association of Southern California.

2. First, the International Longshoreman's Association, an American Federation of Labor affiliate, and then the International Longshoremen and Warehousemen's Union, an affiliate of the Congress of Industrial Organizations.

es and the disciplining of men for misconduct; and (8) It handled during the war an allocation program designed to obtain the most advantageous and equitable use of the available longshoremen.

Prior to 1942 the Army, acting through its subdivision, the San Francisco Port of Embarkation, performed its own stevedoring in the San Francisco Bay area by means of registered longshoremen obtained from the dispatching halls. Although the Army used plaintiff's services in securing these longshoremen, no effort was made by plaintiff to recover compensation for these services, because at this time the Army's use constituted only a minor portion of plaintiff's business. However, during 1941, the Army's use of plaintiff's services and facilities was greatly enlarged due to the increase in the movement of Army cargoes to Pacific bases. Specifically, the employment of longshoremen by the Army increased from approximately 38,000 man-hours in January 1941 to approximately 180,000 man-hours in December 1941. As a result of this increased use, plaintiff's president in December 1941 submitted an oral request to the Water Transportation Branch of the Office of the Quartermaster General that the Army pay for the services it was receiving from the Association. Plaintiff's president was advised that his request would be referred to higher authority with a recommendation favoring payment, but that plaintiff should submit its request in writing.

Accordingly, plaintiff's president on December 20, 1941, and again on January 26, 1942, wrote letters to the Office of the Quartermaster General requesting payment at the same rate paid by members of the Association. Charges to members were on a tonnage basis, but plaintiff's president advised the Army that if it was unwilling to divulge the cargo tonnage passing through the San Francisco port, the Association would be willing to accept, in lieu of the 2½ cents per ton paid by its members, an equivalent rate of 2½ cents per longshore man-hour. These letters were forwarded by the Army in Washington to the Army Transport Service for the San Francisco Port of Embarkation with instructions to investigate the matter, which resulted in numerous conferences being held in San Francisco between representatives of the Army and of plaintiff concerning the nature, extent, and volume of the services rendered to the Army Transport Service.

In April 1942, while plaintiff's proposal was under consideration, a reorganization took place within the Army, and the Chief of Transportation assumed the functions formerly performed by the Quartermaster General, including the negotiations with plaintiff. On June 10, 1942, a committee of the Board of Directors of the Association wrote to Colonel Mellom, Superintendent of the Army Transport Service at San Francisco, renewing the request that the Army share in the expense of maintaining the Association's services. This letter pointed out that such a considerable portion of longshore labor was being used directly by the Army, that contributions from other members of the Association were proving insufficient to meet its running expenses, and concluded by asking that the Army contribute to the expense of the service in the amount of 1.7 cents per man-hour. Following the receipt of this letter, Colonel Mellom on July 9, and July 22, 1942, recommended to the Office of the Chief of Transportation that the Association should be compensated for the services rendered by it to the Army. These communications outlined the nature of the services rendered by the Association but, in view of the fact that some of the services performed by the Association to its regular members were not of particular advantage to the Army, they contained a recommendation that plaintiff be paid upon the basis of 1.7 cents per man-hour of stevedore labor performed, instead of the 2½ cents at first requested. Colonel Mellom's communication also recommended that payment should be effective as of January 1, 1942, as the Army had assumed the major portion of the operations at the port of San Francisco during the latter part of December 1941.

Consideration of plaintiff's request and of Colonel Mellom's recommendations by the Office of the Chief of Transportation continued until September 25, 1942, when the Chief of Transportation wired Colonel

Mellom that a decision had been made to compensate plaintiff, but that the basis for compensation had not been formulated. Colonel Mellom was instructed not to take any action until receipt of further notice. Thereafter, on November 11, 1942, the Office of the Chief of Transportation advised Colonel Mellom's assistant that payment of 1.7 cents per man-hour, commencing as of January 1, 1942, had been approved, and that the necessary contracts should be prepared, but that the details thereof were to be subject to the approval of the Chief of Transportation. This information was immediately relayed to officials of the Association.

Following the receipt of this information two contracts were drafted by the Army, one covering the period from January 1, 1942, to June 30, 1942, inclusive, and the other covering the fiscal year commencing July 1, 1942. These contracts provided for monthly payments by the Army at the rate of 1.7 cents per man-hour, but also stated that they were not binding until approved in writing by the Chief of Transportation. Plaintiff executed these contracts on December 26, 1942, whereupon they were forwarded to the Chief of Transportation for approval. This office took no action toward approving or disapproving these contracts.

Throughout the year 1943 plaintiff's president held numerous conferences with officers in the Office of the Chief of Transportation in an effort to expedite payment for its services. Plaintiff's president was told by the Army's representatives that they had recommended payment and they expected that the Association would be paid, but that the matter had been sent "upstairs" and still remained there. Further conferences were held between officials of the Army and plaintiff's president throughout 1944, and thereafter, but these efforts were without success. Meanwhile, the Army's employment of longshoremen at San Francisco continued to increase until it reached a peak of over 500,000 longshore man-hours per month in March, April, May, and June 1945, which represented approximately 50 percent of the total work performed by longshoremen dispatched through the San Francisco dispatching hall. The Army thus became the largest single employer utilizing the Association's services.

On April 16, 1947, the Association filed a claim with the Army under Section 17 of the Contract Settlement Act of 1944, 58 Stat. 649, 665, 41 U.S.C.A. § 117, to recover the sum of $410,332.80, which represented a rate of 2½ cents per man-hour for the period from January 1, 1942, to July 15, 1946, inclusive. On January 5, 1949, an Army Board of Inquiry issued findings of fact rejecting plaintiff's claim upon several grounds, but primarily upon the ground that no officials of the San Francisco Port of Embarkation having authority to do so had promised payment or requested the Association's services under such circumstances as to imply a promise to pay.

Plaintiff says that the facts related above are sufficient to give rise to an implied contractual obligation by the Army to pay for the services furnished it by the Association. Plaintiff urges that the continuous acceptance by the Government of its services with knowledge that plaintiff expected to be paid, and without ever disclaiming an intention to pay, justified it in assuming an intention to pay. Since the Army received substantially the same services as its members, the Association maintains that it is entitled to receive compensation at the rate of 2½ cents per man-hour, which it says is substantially equivalent to the rate of 2½ cents per manifest ton paid by members. In the alternative, plaintiff argues that it is entitled to recover on the basis of an informal contract under Section 17 of the Contract Settlement Act, supra.

Although defendant admits that the Association demanded payment for its services, it argues that they were supplied under circumstances which negative the existence of an implied contract. Those circumstances according to defendant were (1) the fact that plaintiff was at all times advised that any agreement with respect to compensation would have to be approved by the Chief of Transportation, and (2) the fact that approval of the several drafts of contracts was never actually obtained. Defendant also insists that many of the services which the Association performed on behalf of its members did not inure to

the Army's benefit, and consequently the Association was wrong in requesting the Army to pay compensation at the same rate paid by members of the Association.

■ While it cannot be said that the parties entered into an express contract in the instant case, we are of the opinion that an undertaking to compensate the Association for the fair and reasonable value of its services furnished after its demand for payment may be fairly implied in fact from all of the circumstances, especially the fact of the Army's continued use of such services subsequent to that demand. Clark v. United States, 95 U.S. 539, 542, 24 L.Ed. 518; Niagara Falls Bridge Commission v. United States, 76 F.Supp. 1018, 111 Ct.Cl. 338; Buffalo & Fort Erie Public Bridge Authority v. United States, 65 F.Supp. 476, 106 Ct.Cl. 731; National Carloading Corp. v. United States, 64 F.Supp. 150, 105 Ct. Cl. 479.

The Army at no time disclaimed an intent to pay plaintiff. Rather it continued to demand and accept plaintiff's services and to negotiate with plaintiff in the expectation of making an express contract for payment. Despite defendant's present contention, it recognized the validity of plaintiff's claim for payment for those services, and finally on November 11, 1942, acknowledged to plaintiff its obligation to pay compensation at the rate of 1.7 cents per man-hour from January 1, 1942. This amount was acceptable to plaintiff.

A contract was drawn by the San Francisco branch of the Army Transport Service providing for the payment of this amount, and containing other terms and conditions. It was signed by plaintiff, but never was executed by the headquarters of the Army Transport Service.

Thus no express contract was entered into, but the Army continued to request and to receive plaintiff's services. From this it follows that an implied contract arose to pay reasonable compensation. Cases cited supra.

■ The situation presented by this case is in many respects similar to a case other than those cited supra, the case of Tidewater Coal Exchange v. United States, 67

Ct.Cl. 590, from the opinion in which we quote below. In that case the Government availed itself of the services of a non-profit corporation organized for the purpose of dispatching cargoes of coal at tidewater points. At first the Government paid for these services, but when it discontinued payment, plaintiff sued to recover the reasonable value of its services. In permitting plaintiff to recover, we made the following statement, 67 Ct.Cl. at page 600, which we believe is equally applicable to the facts in this case:

"* * * What is here involved is not an executory but an executed contract, i. e., the defendant has received the full benefit of all the advantages and savings access to the exchange affords, and refused to pay in full for what said services are reasonably worth. It is neither asserted nor contended that the defendant accepted the service as gratuitous, or under circumstances justifying such an inference, for payment was made without question over a long period of time. Starting with the case of Clark v. United States, 95 U.S. 539, 24 L.Ed. 518, and consistently followed since, this court and the Supreme Court have adhered to the rule that a parole contract fully executed by the contractor upon his part, wherein the United States receives all the benefits of the undertaking, imposes a liability upon the latter as upon an implied contract. St. Louis Hay & Grain Co. v. United States, 191 U.S. 159, [24 S.Ct. 47, 48 L.Ed. 130]; United States v. Bethlehem Steel Co., 258 U.S. 321, [42 S.Ct. 334, 66 L.Ed. 639]; [R. P. Andrews & Co. v. U. S.,] Andrews case, 41 Ct.Cl. 48; Moran Bros. v. United States, 39 Ct.Cl. 486."

■ The next question is, what is fair compensation. No better answer to this can be given than what the parties agreed upon, to wit, 1.7 cents per man-hour.

■ Defendant contends that inasmuch as plaintiff did not file its initial petition in this action until October 25, 1948, the recovery by plaintiff for any services rendered to the Army prior to October 25, 1942, is barred by this court's statute of

608

limitations, 28 U.S.C. (Supp. V) § 2501. We think this is correct.

Plaintiff first demanded compensation in December 1941; but, while subordinates in the Army Transport Service acknowledged the justice of plaintiff's request, it was not until September 25, 1942, that the Chief of Transportation acknowledged liability, which was followed by an agreement on November 11, 1942, on the amount of 1.7 cents. The implied contract to pay reasonable compensation arose not later than September 25, 1942. Hence, plaintiff is entitled to recover for all services rendered since that time if within six years of the filing of the petition. The petition was filed on October 25, 1948; and, hence, plaintiff clearly is entitled to recover for services rendered since that time. We think it is further entitled to recover for services during the month of October 1942, for this reason.

It is clear from the evidence that the parties at all times during their negotiations contemplated a monthly system of payment. Such a provision had been incorporated in the contract drafted by the Army in December 1942. Moreover, during November 1943 plaintiff had been instructed to submit monthly bills for the period commencing January 1, 1942. Again, in December 1944, the tentative contract proposed by the Army provided for the payment of a fixed monthly rate. Under such circumstances, plaintiff's claim for services rendered during the month of October 1942 did not accrue until October 31, 1942, when payment for the services could have been first demanded. Pennsylvania Coal and Coke Corporation v. United States, 70 F. Supp. 136, 108 Ct.Cl. 236, 248; Manufacturers Aircraft Association v. United States, 77 Ct.Cl. 481, 518, certiorari denied 291 U.S. 667, 54 S.Ct. 442, 78 L.Ed. 1057. We, therefore, hold that plaintiff's claim for services rendered during the period from January 1 through September 30, 1942, inclusive, is barred by the statute of limitations, but that plaintiff is entitled to recover compensation at the rate of 1.7 cents per man-hour for the period October 1, 1942, through July 15, 1946. As the Army obtained 14,712,501 man-hours of longshore labor during this period, plaintiff is entitled to recover $250,112.50.

Defendant also argues that many of plaintiff's functions were taken over during World War II by the Pacific Coast Maritime Industry Board which had been created by the War Shipping Administration on March 11, 1942. 46 C.F.R., Cum.Supp., § 304.1–7. While many of the purposes and functions for which this Board was established overlapped those which plaintiff performed for its members, the fact remains that the services for which compensation is here sought were sought from plaintiff and were performed by plaintiff rather than by this Board.

We do not think plaintiff is entitled to recover under the terms of the Contract Settlement Act, 41 U.S.C.A. § 101 et seq., but rather under an implied contract. Judgment will be entered for plaintiff in the sum of $250,112.52.

JONES, C. J., and HOWELL, MADDEN and LITTLETON, JJ., concur.