# IN THE COURT OF APPEALS OF TENNESSEE
## AT NASHVILLE
May 21, 2015 Session

## RCR BUILDING CORPORATION v. STATE OF TENNESSEE

**Appeal from the Tennessee Claims Commission**
No. K20130627     Robert N. Hibbett, Commissioner, TN Claims Commission

_____

**No. M2014-01555-COA-R3-CV – Filed August 24, 2015**
_____


This appeal concerns the construction of a welcome center along I-65 North in Ardmore, Tennessee. The State entered into an agreement with a contractor to construct the welcome center and the adjacent roadways and parking lots. As construction progressed, the contractor submitted requests for several changes to the scope of the project, which were denied; the State also denied several pay requests for work the contractor or its subcontractors had already completed. The contractor filed suit against the State alleging nine separate claims for damages. The Claims Commission ruled in favor of the contractor on all claims. The State appeals four of the claims, asserting that the Commission erred in awarding damages. Concluding that the evidence does not preponderate against the Commission's findings of fact, we affirm the Commissioner in all respects.

### Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Tennessee Claims Commission Affirmed

ANDY D. BENNETT, J., delivered the opinion of the court, in which FRANK G. CLEMENT, P.J., M.S., and W. NEAL MCBRAYER, J., joined.

Herbert H. Slatery, III, Attorney General and Reporter; William E. Young, Solicitor General; and Melissa Brodhag, Senior Counsel; for the appellant, State of Tennessee.

Gregory L. Cashion and Craig N. Mangum, Nashville, Tennessee, for the appellee, RCR Building Corporation.

## OPINION

### FACTS AND PROCEDURAL HISTORY

On February 11, 2010, RCR Building Corporation ("RCR") entered into a contract with the State of Tennessee Department of Transportation (the "State" or "TDOT") to demolish and rebuild a welcome center along I-65 North in Ardmore, Tennessee (the "Project"). The Project was financed through the American Recovery and Reinvestment Act and was administered by the Tennessee Department of Finance and Administration, for the ultimate use of the Tennessee Department of Tourism. The State engaged a team of architects and civil engineers from the private sector firms of Kline Swinney & Associates and Vaughn & Melton (collectively the "Design Team"). The Design Team also administered the contract for the Project. Pursuant to Article 7.1 of the contract, RCR or the State could request changes to the contract by: 1) a written change order; 2) a written change directive; or 3) a written order for minor changes.

Thomas Scott, a TDOT inspector, served as the State's on-site representative and Erosion Prevention Inspector. Kevin True was designated as RCR's superintendent for the Project. As construction of the Project progressed, RCR submitted requests for several changes to the scope of the Project, which were denied. The State also denied several of RCR's pay requests for work RCR or its subcontractors had already completed.

On November 8, 2012, RCR filed a complaint with the Tennessee Claims Commission (the "Commission") alleging that "problems with the plans and specifications caused RCR to perform additional work for which RCR has not been compensated," and that the State "directed RCR to perform additional work on the Project for which RCR was not compensated." RCR went on to allege seventeen separate claims for damages against the State. RCR argued that the State was contractually required to pay for the extra work performed by RCR, and thus, the State had breached the contract by failing to pay. On May 10, 2013, the State filed an answer and four counterclaims for RCR's alleged failure to complete the construction project. On January 3, 2014, the State filed a motion for partial summary judgment, which the Commission denied. RCR voluntarily dismissed eight of its seventeen claims prior to trial.

The Commission held a trial on March 10-13, 2014, at which nine witnesses testified, including Mr. Scott and Mr. True.[1] The Commission rendered its decision on July 17, 2014,

---

[1] Each issue raised by the State is heavily fact-intensive and requires a careful examination of the construction plans and the circumstances attendant to the construction of the Project. We will provide specific details of the contract, construction, and testimony, as they relate to each issue on appeal.

ruling in favor of RCR on all nine claims, and awarded RCR a total judgment of $96,754.99. The trial court made findings regarding the "contracting parties and their authority under the contract" and the "credibility of witnesses." The Commission found "the Design Team and State clothed Mr. Scott with the authority to direct activities at the Project work site. The Tribunal finds that Mr. Scott had the apparent authority to bind the State with his words and deeds and had the same authority as the State officers and Design Team under the contract." The Commission further found that the testimony of Mr. Scott was "vague, curt, contradictory and self-serving." The Commission stated, "when Mr. Scott's testimony is contradictory to any other witness[es'] testimony, especially the testimony of Kevin True, then Mr. Scott's testimony shall not be accredited." The Commission held, in pertinent part:

> [T]he State and Design Team breached the contract on every occasion when it had the Claimant change the scope of the work without a Change Order and then ratified the change after the fact. The State cannot hide behind the Contract when it did not follow the terms of the Contract. To allow the State to avoid payment for the work it directed at the expense of the Claimant would defeat substantive justice.

The trial court dismissed the State's counterclaims, finding the counterclaims were "retaliatory in nature."

The State appeals the trial court's ruling on four of the claims. In particular, this appeal concerns: 1) whether RCR should be compensated for the alleged post-contract change to the construction of concrete expansion joints; 2) whether RCR should be compensated for the alleged post-contract change of the truck parking area from asphalt to concrete; 3) whether RCR should be compensated for the installation of additional stone-fill material pursuant to change order number four; and 4) whether RCR should be compensated for the widening of a project roadway that was allegedly authorized by Mr. Scott. The total amount awarded on the claims being appealed is $79,388.85.

STANDARD OF REVIEW

Appeals from decisions of the Tennessee Claims Commission are governed by the Tennessee Rules of Appellate Procedure. Tenn. Code Ann. § 9-8-403(a)(1); *Bowman v. State*, 206 S.W.3d 467, 472 (Tenn. Ct. App. 2006). The Commission hears cases without a jury; therefore, this Court must review the Commission's findings of fact and legal conclusions under the standard of review found in Tenn. R. App. P. 13(d). *Bowman*, 206 S.W.3d at 472. We review the Commission's factual findings de novo with a presumption of correctness unless the evidence preponderates otherwise. *Id.* For the evidence to preponderate against a trial court's finding of fact, it must support another finding of fact

with "greater convincing effect." *Walker v. Sidney Gilreath & Assocs.*, 40 S.W.3d 66, 71 (Tenn. Ct. App. 2000). This Court reviews the Commission's legal conclusions de novo with no presumption of correctness. *Turner v. State*, 184 S.W.3d 701, 704 (Tenn. Ct. App. 2005). Insofar as the Commission based its factual determinations on its assessment of witness credibility, this Court will not reevaluate that assessment absent clear and convincing evidence to the contrary. *Wells v. Tenn. Bd. of Regents*, 9 S.W.3d 779, 783 (Tenn. 1999).

This appeal requires us to construe the contract between RCR and the State. The interpretation of written documents is a matter of law that we review de novo according no presumption of correctness to the trial court's conclusions. *Allstate Ins. Co. v. Watson*, 195 S.W.3d 609, 611 (Tenn. 2006). In "resolving disputes concerning contract interpretation, our task is to ascertain the intention of the parties based upon the usual, natural, and ordinary meaning of the contractual language." *Guiliano v. Cleo, Inc.*, 995 S.W.2d 88, 95 (Tenn. 1999). The determination of the parties' intent is generally treated as a question of law, "because the words of the contract are definite and undisputed." *Planters Gin Co. v. Fed. Compress & Warehouse Co., Inc.*, 78 S.W.3d 885, 890 (Tenn. 2002).

ANALYSIS

I. Concrete Expansion Joints

The first issue concerns the construction of concrete expansion joints in the parking area surrounding the welcome center. When RCR initially bid on the Project, the original contract specifications stated the following with respect to "Joints": "Place expansion joints at 30 foot *intervals*. Align curb, gutter, and sidewalk joints." (Emphasis added). The Design Team's original renderings, entitled "C-500" and dated October 1, 2009, depicted the joints as diagonal lines spaced thirty feet apart in the truck parking area.

On May 24, 2010, before the Project began, the Design Team provided a "Proposal Request No. 22" that stated: "Revise Truck Parking Lot saw cuts, steel dowels and sealants to achieve 15 ft. by 15 ft. final *grid* in lieu of 13 ft. by 30 ft. *grid* indicated in specifications. See attached drawing." (Emphasis added). The attached drawing, entitled "C-502 Paving Plan revision," dated May 19, 2010, portrayed longitudinal and transverse joints intersecting in a grid-like pattern in the parking area. The original rendering of the Project did not depict a grid pattern on the concrete; rather, the depiction showed diagonal lines spaced at thirty foot intervals without any intersecting lines.

The change requesting joints every fifteen feet rather than every thirty feet was reflected in change order number four, which stated: "Add cost to contract for change in parking lot joints from 30 to 15 foot on center . . . ." Thus, the State paid RCR for the change

4

in placement of joints at fifteen foot intervals instead of thirty foot intervals. Nevertheless, RCR argued it should receive an additional $5,751.91 because it did not bid for expansion joints in a "grid" in its bid, since the original contract called for expansion joints to be placed at "intervals." The State argued that "interval" means "grid," and that interpreting the word "interval" in another fashion would be "extremely uncommon."

With respect to expansion joints, the Commission held as follows:

> The Claimant alleges that the original plans only called for control joints to be installed at thirty-foot intervals and this was included in the original bid. (Exhibit 27) The Design Team produced a revised set of plans showing control joints in a fifteen-foot by fifteen-foot grid pattern. The Claimant constructed the grid pattern as shown and instructed by the Design Team. It is apparent that the Design Team approved the change. (Exhibit 29) Mr. True testified that the change was not included in the original plans or bid. The Claimant requested approval for payment for the change in plans as approved and constructed. (Exhibit 30) The State denied payment for the materials and labor.
> The Tribunal finds the 15' by 15' control joint grid was not included in the original plans or bid. Therefore, the State is liable for $5,751.91 for the additional work and labor.

We have carefully reviewed the record, including the architectural renderings and relevant testimony, and we have concluded that the evidence does not preponderate against the trial court's finding that RCR did not include the cost to construct the control joints in a "grid" pattern when it bid on the Project. After RCR submitted its bid, the State changed its description regarding the construction of joints from "interval," in its initial contract specifications, to "grid," in Request No. 22. RCR interpreted the word "interval" and the architectural rendering accompanying it, to require concrete expansion joints in a diagonal pattern without intersecting lines. RCR's bid included the cost for constructing these diagonal intervals; its bid did not include the cost of constructing a "grid." Therefore, we affirm the Claims Commission's ruling holding the state liable for $5,751.91 for the additional work and labor RCR expended in constructing a grid pattern for the concrete control joints.

II. Concrete Truck Parking Area

The Project required RCR to demolish an existing asphalt truck parking lot and replace that parking lot with a new concrete parking area. At issue is whether RCR should be compensated for constructing a 15 by 320 foot enlargement ("the enlargement") adjoining the

existing parking lot in concrete rather than asphalt.  In addressing this issue, it is helpful to juxtapose the original contract specifications and renderings with the revised specifications and renderings the State provided after RCR submitted its bid.

When RCR initially bid on the Project, the Design Team's original renderings of the Project distinguished between the existing truck parking area and the enlargement by using dots for the existing truck parking area and closely spaced diagonal lines for the enlargement.  An arrow pointed to the area of the existing truck parking area stated:

> NOTE:  ADD ALTERNATE NO. 1
> REPLACE EX. TRUCK PARKING
> AREA SHOWN WITH FULL-DEPTH 9" CONCRETE
> PAVEMENT & BASE

Another arrow pointed to the enlargement area and stated:

> HEAVY-DUTY ASPHALT
> (FOR NEW CONSTRUCTION ONLY)
> (SEE ADD ALTERNATE)

Exhibit 46 provides a "description" of "Alternate #1" which states, in pertinent part:

> Paving in truck parking area to be concrete paving in lieu of asphalt paving. Work consists of full-depth removal of existing truck parking to the limits shown in the Plans.  Existing pavement, base, and other obstructions shall be removed to a sufficient depth to allow for placement of 4" minimum . . . .

On April 28, 2010, over two months after RCR entered into the contract, the Design Team provided a revised drawing in which the note and arrow pointing to the enlargement area was eliminated.  The meeting minutes following a Design Team meeting on May 13, 2010, included the following note:  "It was discovered that civil drawings still had notes referring to asphalt at truck parking; these will be removed."

With respect to the concrete truck parking area, the Commission stated:

> Claimant contracted to remove the existing truck parking lot and replace it with a permeable asphalt base and nine inches of concrete. (Exhibit 46) Although the drawn plan of the Project shows the truck parking lot to be concrete, it shows the borders of the truck parking lot to be heavy-duty asphalt with a note. The Design Team made it clear that it intended that the parking lot

6

and the borders be nine inch concrete. The Design Team amended its drawing (Exhibit 48) removing the heavy-duty asphalt note. The Design Team noted that it was removing the notes referring to asphalt at the truck parking area. (Exhibit 48 page 104) The Claimant had not bid these additional strips or borders as concrete but as heavy-duty asphalt according to the original drawn plan. In the end, the Claimant did install nine-inch concrete in the truck parking lot including the borders as directed by the Design Team and the State. Claimant requested payment for the additional costs involved in installing the concrete instead of asphalt. The State did not approve payment. The Tribunal finds that the additional concrete was not covered by the original bid. The State is liable for the additional costs and the Claimant is awarded $36,365.11 for the installation of the additional concrete.

The State asserts that "[i]t would not be sound construction practice or common sense to leave one portion of a parking lot constructed of a different material that would expand and contract in varying degrees over time." The State suggests that "if RCR underbid this part of the project because it misunderstood the plans and specification, the State is not required to compensate for its own error." We disagree.

Our inquiry does not focus on whether it is a sound construction practice to construct a parking lot out of two different materials; rather, we must consider whether the evidence preponderates against the Commission's findings that the additional concrete required to pave the enlargement was not covered by RCR's original bid. RCR's superintendent, Kevin True, testified regarding the concrete parking area and enlargement as follows:

Q: Just so we're clear, when you bid that, you did not bid as part of the Add Alternate Number 1 the heavy-duty asphalt portions of this shown on here?

A. They're – they're clearly shown as heavy-duty asphalt and identified with a note. And the written verbiage at Add Alternate 1 says, Existing truck parking only.

Q. So the note that is on there, I want you to read that into the record here. This note right there (indicating), what does that say? And I'm looking at Exhibit C-500.

A. It says, Heavy-duty asphalt for new construction only. So it's a new construction heavy-duty asphalt. And it says, See add alternate, but it doesn't say which add alternate or - - should be on the record, but that's all.

7

Q. But here they're showing me this is concrete, and they're still showing me this is asphalt?

A. Correct.

Q. And you did not bid that as con - - - these strips as concrete, did you?

A. No, and that was relayed to the design team very early on in the project.

After reviewing the contract specifications, Design Team revisions, and the testimony of Mr. True, we find that the evidence does not preponderate against the Claims Commission's finding that the additional concrete required to pave the enlargement area was not included in RCR's original bid. The original renderings included a note referring to "heavy duty asphalt" and an arrow pointing to the "new construction"/enlargement area. While it is clear that the existing parking area was to be demolished and repaved in concrete, it is not clear from the renderings that the enlargement was to be concrete. The State attempted to clarify or alter the plans after RCR submitted its bid, but RCR did not have the benefit of the revised plans until after its bid was submitted and the contract was signed. Therefore, we affirm the Claims Commission's award of $36,365.11 to RCR for the installation of the additional concrete.

III. Stone-Fill Installed at Parking Lots

Next, we must consider whether the Claims Commission erred in awarding RCR a judgment for $20,774.22 for installing additional "stone-fill" or "pug-mix"[2] in the parking lot area of the Project. The State argues that the award includes payment for stone-fill RCR included in its lump-sum bid. RCR asserts that pursuant to the original contract, RCR intended to use "dirt-fill" or a type of soil, not stone-fill as the State argues. RCR contends it should be paid for all of the stone-fill actually installed.

The parties do not dispute that, once work on the Project began, an unexpected site condition was discovered which necessitated the use of stone-fill. Kevin True testified regarding the unexpected site condition discovered by RCR and the eventual need to install stone-fill in the parking area as follows:

A. . . . Unexpected cement base, which - - and in construction, we call that hidden construction. I believe most contracts have a provision for hidden

---

[2] At various times in the record and testimony, the words "stone-fill" and "pug-mix" are used interchangeably. For the sake of consistency, we will use the term stone-fill.

8

conditions.

We encountered cement base, and a redesign was done by Vaughn-Melton that showed -- well, let me back up.

The design team did not want us to remove this cement base because, A, it would have been very expensive to hoe-ram it out and haul it off; and then it was 12 to 16 inches deep, and then we would have been below our subgrade and had to bring that all the way back up to the finished grades for paving with stone, so very expensive.

At progress meetings, Thomas Scott brought up repeatedly, I don't want to tear up perfectly good cement base, let's leave it and come up from there. The design team agreed. Vaughn-Melton's redesign showed us using soil on top of the cement. It's all cement.

Again, at progress meetings with the design team, including civil engineer on-site, Thomas Scott was insistent that we could not put soil on top of cement and then put more cement on top of that. He kept calling it a soil sandwich or cement sandwich.

Q. So even though Vaughn-Melton designed it that way, Mr. Scott is [m]aking that decision on it? He's disagreeing with it, correct?

A. Disagreeing with the design team and ultimately overriding them, or they back him up. I don't know. It's in writing that they backed him up and issued change orders to do the work that he brought to the table.

Q. Okay.

A. So to make the long story short, the soil that per the original drawings we would have placed in the parking lot to bring the parking lot to grade was excess soil. It would have been used on-site, per the original drawings. This hidden condition, which we're now told we couldn't put soil on -- it had to be pug mix -- . . . .

Andrew Hutsell, a professional engineer who assisted the Design Team with grading design was called by the State to testify regarding the construction of the parking lots surrounding the welcome center. Mr. Hutsell described the scope of the Project as "raising the grade on portions of the existing parking lot" and reconfiguring the existing parking lot to allow for more parking spaces. To achieve the proper grade for the pavement of the parking lot, RCR was required to "mill" out or remove a portion of the existing asphalt. The State questioned Mr. Hutsell regarding the process of milling the asphalt and creating the proper grade, as follows:

9

Q. Okay. All right. And so now, if the -- if the contractor reads the plans and -- the design intent to C-500 on the original plans to mill the whole -- the whole bit, then they would necessarily, would they not, also have planned to -- to place stone there to -- to redo it?

A. If their interpretation of the -- of the plans were to mill all of the asphalt off of the site instead of performing a mill-overlay type operation, then to achieve the grades, as specified on the profile, that material would have to be [re]placed with something, whether that be rock *or dirt* or some other suitable material.

Q. Okay. And for TDOT specifications, it would need to be stone; is that right?

A. The -- that would be typical. The -- the project manual -- my recollection is the project manual did allow for placement of -- or would have allowed for the placement of -- of *soil material or fill*, but the discovery of the cement-treated based [sic] and a -- being present underneath the existing asphalt required that the fill from the top of that base, leaving the base in place, had to be rock.

(Emphasis added).

A written change order was created and signed by the contractor, designer, and owner which described the unanticipated site condition and the work to be performed. Change order number four stated:

Add cost to contract sum to replace dirt fill with pug mix. Additional, estimated 714 tons pug mix was required to bring parking lot to grade due to unexpected cement base below existing asphalt. If the pug mix exceed[s] 714 ton[s], after compaction, a change order will be issued based on the TDOT's superintend[e]nt monitoring the job.

The Design Team sent a cover letter along with change order number four, which stated the following:

TDOT's on-site inspector will monitor the quantity of pug mix placed to bring the existing grade to proper sub grade level. If the quantity exceeds 714 tons then the GC will be paid $23.53 per additional tonnage placed on site.

Tommy Scott, TDOT field inspector, will let the Designer know if anticipated

10

quantity is going to exceed 714 tons by more than 20%.

It should be noted that these additional costs are required due to presence of cement base below the existing pavement and gravel. The cement base was not anticipated thus, the specified dirt fill per plans was not acceptable.

Mr. Scott monitored the installation process as the construction progressed and notified RCR at a project meeting that an additional 1049 tons of stone was installed pursuant to change order number four. RCR submitted a request for payment based on Mr. Scott's statement, which the State refused to pay. The State asserts that the amount of stone required underneath the curb and six inches beyond the curb and gutter sections were necessarily included in RCR's original bid, and thus, "[b]y not subtracting the base stone in the original contract the [State] would be paying for this stone twice."

When ruling on this issue, the Claims Commission stated, as follows:

> The Design Team (Kline Swinney & Associates and Vaughn and Melton) directed that a layer of crushed stone should be installed upon the existing soil cement beneath the truck parking lot. Change Order 4 (Trial Exhibit 6) was issued to compensate RCR for 714 additional tons of crushed stone and required the TDOT representative, Thomas Scott, to keep track of the amount of additional stone above 714 tons that was installed. It was determined by Thomas Scott that an additional 1049 tons of stone exceeding the original 714 tons was installed in the layer. (Exhibit 16 page 25) However, the State only approved compensation for an additional 288 tons based upon the Design Team's mathematical calculation. The State should have given credit for all the stone that was actually installed; not just what was mathematically calculated. The Tribunal makes a specific finding that this additional installed stone was not part of the original bid. Therefore, RCR is owed compensation for an additional 761 tons of crushed stone that was installed in the parking lot. RCR shall be awarded $20,774.22 for this claim.

We have reviewed the evidence and find that the evidence does not preponderate against the Claims Commission's finding that the "additional installed stone was not part of the original bid." In other words, the evidence does not support another finding of fact with greater convincing effect. *See Walker*, 40 S.W.3d at 71. Therefore, we affirm the Claims Commission's award of $20,774.22 for this claim.

IV. Widening of an Access Road

Finally, we consider the State's argument that the Claims Commission erred in awarding RCR a judgment for $16,497.61 for the widening of an access road. The original plans for the Project called for a twelve-foot-wide, paved access road to the welcome center. Kevin True testified that he put road stakes "with the 12-foot-width road written right on the stakes" in the ground where the subcontractor was to pave the road on the Project site. Mr. True stated that he "personally witnessed Thomas Scott go down through here and pull all the stakes out, take a upside-down paint wand, which is a stake you put the paint in so you don't have to bend over, and mark this road [twenty feet across]." He further testified that the subcontractor then paved the road to the paint marks Mr. Scott put in place. Thus, the road was paved eight feet wider than the contract called for, and RCR incurred additional expenses in paying the subcontractor for the work performed.

In contrast, Mr. Scott testified regarding the access road as follows:

A. Well, I think the best I recollect, it was on a Saturday. The paving contractor, that was the only thing lacking being paved was the access road.

Q. Okay.

A. It was staked. Contractor came in. He paved from stake to stake. And that's, you know, pretty much it.

Q. Was Mr. True or anyone from RCR present when this paving contractor came to the site on Saturday?

A. No.

Q. Did you ever pull up the contractor's stakes and paint the lines and tell the paving subcontractor you wanted that road that wide and they needed to do it your way?

A. No.

On December 29, 2010, RCR submitted a letter to the Design Team, which stated in pertinent part, as follows:

Please accept this letter and the attached cost breakdown as our response to the

12

costs as directed by the on-site TDOT AHJ[3] to install an access road 20' wide versus the contract required 12' wide. This work was not originally completed per a contract document, but rather as directed by the AHJ at the site. The work results in an ADD of $16,497.61 to the contract.

In response to RCR's letter, the Design Team visited the Project site and discussed the access road with Mr. True and Mr. Scott. As a result of this meeting, the Design Team sent a letter to RCR, which stated as follows:

On February 16, 2011 [the Design Team] visited the site and discussed the [widening of the access road] with Kevin True of RCR and Tommy Scott with TDOT. Following is our understanding from them as to what occurred:

1.  RCR's surveyor staked out both sides of the access road at 16 ft. width.
2.  [The Subcontractor] placed one layer of stone from stake to stake at 16 ft wide.
3.  At a later date [the Subcontractor] placed an additional layer of stone widening the road by approximately 4 ft. or a total width of 20 ft.
4.  When the pavers came on site on a Saturday they placed the asphalt at 20 ft. to match the stone width.
5.  Both Mr. True and Mr. Scott were on site and both stated they gave no direction to [the Subcontractor] or their paver as to width of asphalt.

I understand RCR's and [the Subcontractor's] desire for reimbursement for added pavement. However, we see no reason for the Owner to bear this cost. Therefore, your request is denied.

Mr. True testified regarding his meeting with the Design Team on February 16, 2011:

Now, [members of the Design Team] did question me about this, but they questioned me with Thomas Scott in the same group. And this was on-site. And I didn't say anything. I didn't answer them. They asked me if I gave any direction to Rogers Group, and I didn't answer. And they asked Tommy if he did, and he said no.
Now, after this meeting, I took [a member of the Design Team] to the side, and I said, . . . you know how Tommy - - you know, he's threatened me and everything else, and he's already told me that if I say anything about this, he's going to make it hard on me the rest of the job. I'll never get out of there.

_____

[3] The TDOT AHJ in this case is Thomas Scott.

13

I'll never get complete - - I'll never get the fun shifts. We'll be there for another year. So I said, I object to this meeting, and I feel it was under duress.

And then even though that was discussed . . . [the Design Team] wrote a letter that included my name. And it's kind of misleading [the] way my name is included in that letter.

The State cites Tenn. Code Ann. § 9-8-307 and argues that the Claims Commission lacked jurisdiction to address this issue because the Commission can only award relief on the basis of written contracts. The State views Mr. Scott's alleged actions in expanding the area to be paved as an unwritten modification to the contract for which the Commission lacks jurisdiction. In support of its argument, the State points to the contract provision that requires all changes to the scope of the Project to be made in writing. Alternatively, the State asserts that the evidence preponderates against the Commission's finding that Mr. Scott ordered the widening of the road and that Mr. True "failed to adequately supervise the work of RCR's subcontractor."

RCR asserts that Mr. Scott "had apparent authority to direct the activities at the Project pursuant to the terms of the contract." At trial, RCR submitted exhibit fifteen, which outlined fourteen separate instances where Mr. Scott directed RCR to perform some type of work, and the State would later issue an ex post facto change order ratifying Mr. Scott's on-site directive.[4] RCR asserts that "the State did not want the clerical burden of hundreds of change orders that would be created by requiring a written change for every modification of RCR's scope of work."

The Commission determined that Mr. Scott had apparent authority to direct RCR's work at the Project. Specifically, the Commissioner stated:

It is abundantly clear that the Design Team and State clothed Mr. Scott with the authority to direct activities at the Project work site. The Tribunal finds that Mr. Scott had the apparent authority to bind the State with his words and deeds and had the same authority as the State officers and Design Team under the contract.

When ruling whether RCR was entitled to be compensated for the widening of the access road, the Commissioner held:

A Welcome Center access road was originally planned and bid to be twelve

---

[4] The Commission specifically determined that exhibit fifteen was "credible and accurately portrays Mr. Scott's activities, directions and labor on behalf of the State."

14

feet wide. Claimant alleges that Thomas Scott painted the dimensions of the road and expanded it to twenty feet which was paved by Claimant's subcontractor. Mr. True personally staked the access road with road stakes on the centerline with writing indicating a twelve-foot wide road. He personally witnessed Thomas Scott pull all the stakes out of the roadbed and paint the dimensions of the road twenty feet across. The subcontractor, Rogers Group, came and paved to the paint marks place by Thomas Scott. In a meeting with Bob Swinney and David Kline of the Design Group that was attended by Thomas Scott, Mr. True said nothing because of the presence of Thomas Scott. He later protested that he was under duress by the presence and threats of Thomas Scott and then testified the contents of Exhibit 39 were basically untrue. *The Tribunal accredits and believes the testimony of Mr. True.* The Tribunal finds that the Design Team had no understanding of what had actually happened that caused Rogers Group to pave a twenty-foot wide road. Therefore, the claim for $16,497.61 for the added costs paid to the subcontractor is reasonable and shall be awarded to the Claimant.

(Emphasis added). As further reasoning for its decision, the Commissioner stated:

Furthermore, the State and Design Team breached the contract on every occasion when it had the Claimant change the scope of the work without a Change Order and then ratified the change after the fact. The State cannot hide behind the Contract when it did not follow the terms of the Contract. To allow the State to avoid payment for the work it directed at the expense of the Claimant would defeat substantive justice.

In addition, the Commissioner made specific findings with respect to Mr. Scott's credibility. Particularly relevant to this issue are the following findings:

[W]hen Mr. Scott's testimony is contradictory to any other witness testimony, especially the testimony of Kevin True, then Mr. Scott's testimony shall not be accredited. Furthermore, the Tribunal finds that Mr. Scott aggressively directed RCR and its subcontractors to make many changes in this project. His superiors and the design team allowed him to direct the activities of the Claimant and its agents and employees.

We do not frame this issue as a question of jurisdiction as the State urges. Tennessee Code Annotated section 9-8-307(a)(1)(L) states that the Commission has exclusive jurisdiction to determine all monetary claims against the State based on "[a]ctions for breach of a *written* contract between the claimant and the state." (Emphasis added). There is no

15

question that there is a written contract between the parties in this case. The written contract called for written change orders when either party wished to deviate from the original plans for the Project. We must determine whether RCR is entitled to compensation for the widening of a roadway where there was no written change order ratifying the change prior to implementation of the change. We will address the issue by interpreting the contract and examining the circumstances surrounding it, as the Commissioner did below.

This Court has addressed written change order requirements on prior occasions. In *Moore Constr. Co., Inc. v. Clarksville Dep't of Elec.*, 707 S.W.2d 1, 12-13 (Tenn. Ct. App. 1985), this Court explained:

> Including a written change order requirement in a construction contract is not uncommon. It promotes a more definite understanding between the parties and thus, helps to avoid potential controversies. *Bannon v. Jackson*, 121 Tenn. 381, 391, 117 S.W. 504, 506 (1908). It benefits the owner primarily because it provides formal notice that a claim is being made thereby giving the owner an opportunity to take appropriate corrective action or to prepare a proper response to the claims. In Tennessee, as in a majority of jurisdictions, these provisions are valid and binding. *W & O Construction Co. v. City of Smithville*, 557 S.W.2d 920, 922 (Tenn. 1977). However, like other contractual provisions, they can be waived or abrogated by the parties.

> The waiver of a written change order requirement by an owner is not always required to be in writing but may be the result of the parties' conduct on the job. Thus, it is not uncommon for courts to find that an owner has waived a written notice requirement in cases where extra work has been ordered verbally by the owner or the extra work has been performed with the owner's knowledge and without its objection. *See* Annot., 1 A.L.R.3d 1273 §§ 14 & 15 (1965).

> The course of dealing between the parties can also amount to a waiver where the conduct of the parties makes it clear that they did not intend to rely strictly upon a contract's written notice requirement and that adherence to such a requirement would serve no useful purpose. *Copco Steel & Engineering Co. v. United States*, 341 F.2d 590, 598 (Ct. Cl. 1965), and *Willey v. Terry & Wright of Kentucky, Inc.*, 421 S.W.2d 362, 363 (Ky. App. 1967). Thus, an owner's consideration of a claim on its merits without invoking a formal written notice requirement has been held to amount to the waiver of the requirement thereby preventing the owner from asserting this claim at a later time. *Blount Brothers Corp. v. United States*, 424 F.2d 1074, 1076 (Ct. Cl.

1970); *Morrison-Knudsen Co. v. United States*, 397 F.2d 826, 848 (Ct. Cl. 1968). Once a party has waived the requirement with regard to a particular matter, it cannot revoke its waiver, in whole or in part, at its convenience. *Copco Steel & Engineering Co. v. United States*, 341 F.2d 590, 599 (Ct. Cl. 1965).

(Footnote omitted); *see also M.R. Stokes Co., Inc. v. Shular*, No. M2006-02659-COA-R3-CV, 2008 WL 544665, at *4 (Tenn. Ct. App. Feb. 26, 2008) (pointing out that "contract provisions can be waived, especially in construction projects because of the nature of construction which often require decisions to be made quickly to keep the project progressing.").

The Commissioner determined that the State "breached the contract on every occasion when it had the Claimant change the scope of the work without a Change Order and then ratified the change after the fact. The State cannot hide behind the Contract when it did not follow the terms of the Contract." We could not agree with the Commissioner more. The course of dealing between the parties made it clear that they did not intend to rely strictly on the contract's formal change order requirements; rather, the parties implemented a system whereby the State's on-site representative, Mr. Scott, would suggest a change, and the parties would later provide the paperwork to the State to ratify the change. We give great deference to the Commission's assessment of witness credibility on this point. *See Wells*, 9 S.W.3d at 783. The parties' course of dealing essentially waived the formal written change order requirement. *See Moore Constr. Co.*, 707 S.W.2d at 12-13. Both parties benefitted from this system: the State was not burdened with dozens of change orders requiring prior approval before implementation, and RCR was able to stay on task. The Claims Commission did not err in awarding RCR the difference between the cost of paving a twelve-foot road and the cost of paving a twenty-foot road as Mr. Scott directed.

## CONCLUSION

For the foregoing reasons, we affirm the Commission in all respects. Costs of the appeal are assessed against the State, for which execution may issue if necessary.

_____
ANDY D. BENNETT, JUDGE

17